AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, Council 31, Petitioner, v. ILLINOIS LABOR RELATIONS BOARD STATE PANEL *et al.*, Respondents.

Fifth District    No. 5—02—0560

Opinion filed July 27, 2004.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for petitioner.

Lisa Madigan, Attorney General (Paul Racette, Assistant Attorney General, of counsel), and Jacalyn Zimmerman, of Illinois State Labor Relations Board, both of Chicago, for respondents Illinois Labor Relations Board State Panel and Department of Central Management Services.

Robert E. Arroyo, of Jackson Lewis L.L.P., of Chicago, and Edward M. Cherof and Jonathan J. Spitz, both of Jackson Lewis, L.L.P., of Atlanta, Georgia, for respondent Wexford Health Sources, Inc.

JUSTICE MAAG delivered the opinion of the court:

The American Federation of State, County and Municipal Employees, Council 31 (Union), appeals the decision of the Illinois Labor Relations Board State Panel (Board) to dismiss a case involving a certification petition and a companion case involving unfair labor practices claims. The Union filed the cases on behalf of health care workers who are employed by Wexford Health Sources, Inc. (Wexford), and who provide health care services to inmates incarcerated in facilities of the Department of Corrections (DOC). The Board determined that the DOC was not an employer of the Wexford employees, and the Board dismissed the cases for a lack of jurisdiction. On review, the Union claims that the Board's decision is erroneous because the DOC possesses authority to control labor relations in regard to the work it contracted to Wexford according to the terms of the vendor contract and because the DOC's actual exercise of control over labor relations in regard to the work it contracted to Wexford is sufficient t confer employer status on the DOC.

Pursuant to procedures under the National Labor Relations Act (29 U.S.C. § 151 et seq. (2000)), the Union became the exclusive bargaining representative of the Wexford employees who work at the DOC's correctional facilities (except the Shawnee facility) in 1997. Subsequently, the Union and Wexford negotiated a collective bargaining agreement covering those Wexford employees.

In November 2000, the Union filed a certification petition on behalf of health care workers who were employed by Wexford and who provided services to the inmates at the DOC's facilities. In the petition, the Union identified the DOC as an employer and sought to represent all Wexford employees who worked in the health care units at the DOC's correctional facilities. As a part of its filing, the Union noted that the employees in the proposed unit are in an existing identical unit that it represents and that Wexford is an employer under the

jurisdiction of the federal Labor Management Relations Act, 1947 (29 U.S.C. § 141 *et seq.* (2000)). An administrative law judge determined that the DOC was not an employer of the Wexford employees, and the administrative law judge recommended that the certification petition be dismissed.

In November 2000, the Union also filed a charge alleging that the DOC had committed unfair labor practices in relation to the discharge of Jan Welty, a Wexford employee who worked as a registered nurse at the DOC's Western Illinois Correctional Center. Specifically, the Union charged that Jan Welty was active on behalf of the Union at the Western Illinois Correctional Center and that the DOC and Wexford initiated discharge proceedings against her as retaliation for her union activity. Relying in part on the recommended decision to dismiss the certification petition, the executive director of the Board recommended that the unfair labor practices charge be dismissed for a lack of jurisdiction.

The Union filed exceptions to the decision in each case. Following oral arguments, the Board consolidated the certification matter and the unfair labor practices case for purposes of its decision. After considering the testimony and the documentary evidence in the record, the Board concluded that the DOC was not an employer of the Wexford employees, and the Board dismissed both cases on the ground of a lack of jurisdiction. In its decision, the Board found that the DOC exercised "nothing more than a mere perfunctory review and oversight of the vendor contract and the Wexford employees' employment conditions."

## I. BACKGROUND

The State of Illinois and its agencies are public employers under section 3(*o*) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(*o*) (West 2000)). The intent of the Act is to regulate labor relations between public employers and public employees, to prescribe the legitimate rights of both public employees and public employers, and to provide peaceful and orderly procedures for the protection of the rights of all. 5 ILCS 315/2 (West 2000). The DOC is a state agency. It is required to provide medical care to the inmates incarcerated in its facilities. From time to time, the Department of Central Management Services (Central Management) subcontracts with private corporations to provide services to the DOC and other state agencies.

### The Vendor Contract

In this case, the DOC, through Central Management, contracted with Wexford to provide comprehensive health care services to inmates housed at 19 DOC facilities. Wexford is a private corporation that

employs health care workers and assigns them to health care facilities, including health care units located in DOC facilities. The Wexford health care workers include registered nurses, licensed practical nurses, directors of nursing, pharmacists, pharmacy technicians, dentists, dental assistants and hygienists, X-ray technicians, psychologists, mental health workers, staff assistants, medical records directors, and medical directors. Because DOC facilities have different needs, there are a number of vendor contracts between the DOC and Wexford. Each contract identifies the facilities covered in that agreement. However, all the vendor contracts contain standard terms and conditions regarding the provision of health care services by Wexford.

The vendor contracts identify Wexford as an independent contractor. Under each contract, Wexford is liable for its employees' negligent acts and omissions in the performance of its duties under the contract. In each contract, the DOC and Wexford have agreed to an estimated annual amount of money to be paid by the DOC to Wexford for the provided services. The estimate is derived from the amount calculated for staff services based on the number of hours Wexford employees work, a fixed management fee, and variable expenses, such as pharmacy and laboratory costs, which fluctuate with the prison census. A budget schedule in the contract establishes the specific amount that the DOC will pay for each health care unit staff position at each DOC facility. Wexford is not required to pay its employees according to that schedule and may establish its own wage rates.

The composition of the health care unit staff varies, depending upon the needs of the particular facility. Each contract details the staff positions that compose the health care unit. In some facilities state employees work in the health care unit alongside Wexford employees and hold the same positions as Wexford employees. The vendor contract describes the specific staffing requirements and the number of on-site hours and work schedule for each staff position. The contract identifies the minimum qualifications for each position. It requires applicants to have prior health care experience, letters of recommendation, and applicable licenses. Only the DOC can grant an exemption from one or more of the qualifications.

The vendor contract states that Wexford is responsible for recruiting and interviewing candidates for the staff positions in the health care unit. The contract requires all Wexford employees to pass a background investigation and random drug testing conducted by the DOC. The contract provides that the final selection of any applicant is subject to the DOC's approval and that the initial and continued employment of staff shall be subject to the DOC's approval.

The vendor contract provides that Wexford must provide success-

ful applicants with job descriptions. The job description must be approved by the DOC and must clearly identify the responsibilities of the person filling that position. Under the contract, the applicants employed by Wexford are required to attend the same training academy as all state employees who work at the DOC's correctional facilities. In addition, Wexford is required to provide its employees with 40 hours of in-service training annually.

Under the contract, Wexford is required to evaluate its employees, and a health care unit administrator employed by the DOC is required to participate in and/or conduct evaluations of Wexford employees. The DOC unit administrator oversees the health care unit and monitors the vendor contract on behalf of the DOC. The unit administrator is required to monitor Wexford employees for compliance with the DOC's administrative directives and institutional directives. These directives cover matters such as the maintenance of medical records, the administration of medication, the control of medication and instruments, and response to medical emergencies. The unit administrator issues memos, conducts staff meetings, and provides guidance to Wexford employees regarding the directives. The unit administrator is required to participate in and/or conduct Wexford employee evaluations.

The vendor contract requires Wexford employees to spend their work hours at the facility to which they are assigned. Under the collective bargaining agreement between Wexford and the Union, Wexford employees can accumulate personal time off and request that time through the use of a request form. The vendor contract requires that the unit administrator sign off on any personal time requested by Wexford employees. If Wexford employees normally assigned to the schedule are unavailable and replacement personnel must be called in to cover shifts, the replacements are required to have advance written approval from the DOC. Under the vendor contract, Wexford employees may be required to work overtime to meet the DOC's operational needs as determined by the unit administrator. The contract states that Wexford may grant compensatory time in lieu of overtime pay only if approved by the DOC unit administrator. If an employee works overtime without the approval of the unit administrator, Wexford will pay the overtime pursuant to its collective bargaining agreement with the Union, but the DOC will not reimburse Wexford for the overtime.

Though the vendor contract provides that Wexford regional managers and on-site supervisors are responsible for disciplining Wexford employees, the unit administrators may report to Wexford supervisors any conduct they believe warrants discipline. According to the record, unit administrators have filed reports on Wexford

employees for violations of the DOC's directives and for conduct directly related to provisions in the vendor contract, such as time-sheet violations. In some cases, the unit administrators have recommended that Wexford employees be disciplined for violations, and the unit administrators have recommended a specific discipline. The DOC may revoke a Wexford employee's security clearance by issuing a stop order.

### Pertinent Provisions of the Collective Bargaining Agreement

The collective bargaining agreement states that Wexford may discipline employees through verbal and written reprimands, suspensions, and discharges. Under the collective bargaining agreement, when the DOC issues a stop order, the employee will be suspended without pay. The employee will not be discharged until an investigation has been concluded and the grievance procedure exhausted. The collective bargaining agreement also states that the Union and Wexford will "jointly request that the [DOC] provide the employee with a due process hearing."

In one section of the collective bargaining agreement, Wexford agrees to support the appointment of a Union-designated bargaining unit member to the DOC's Labor/Management Committee and Health Care Unit Quality Assurance Committee at each facility. According to the agreement, if those appointments are not approved by the DOC, the parties shall meet to discuss possible alternatives in order to provide the Union and its members with an opportunity for a meaningful discussion of those issues. A separate section titled "Safety and Health" states that the parties shall jointly request that the Union be permitted to designate an employee representative or representatives to serve on each facility's Safety Committee.

### The Board's Findings and Conclusions

In this case, the Board determined that the DOC did not have significant control over the employment conditions of the Wexford employees so as to engage in meaningful collective bargaining under the Act (5 ILCS 315/1 *et seq.* (West 2000)). In its written decision, the Board pointed to certain factors to support its determination.

One factor was hiring. The Board found that Wexford alone recruits applicants and reviews their applications, decides whom to interview, and issues the final offer of employment. The Board acknowledged that the vendor contract requires Wexford applicants to undergo a background investigation, including drug testing, performed by the DOC, but it concluded that the background investigation requirement was "more a matter of maintaining security and safety in the correctional setting than a condition of employment" set by the

DOC. The Board also determined that the other minimum qualification standards imposed by the DOC were insufficient to defeat a finding that Wexford had sole authority for hiring personnel.

Another factor was the instruction, direction, and evaluation of the Wexford employees. The Board found that Wexford alone determined whether health care positions will be full-time or part-time; that Wexford supervisors instructed and directed employees in the proper performance of their duties and made work assignments on a daily basis; that Wexford supervisors, in large part, were responsible for monitoring the staffing levels and approving personal-time requests according to the company's personnel rules; and that Wexford supervisors were responsible for evaluating the employees and their work performance. The Board acknowledged that the DOC unit supervisors conducted staff meetings and provided guidance on DOC-promulgated directives and that the DOC decided the number and type of positions that compose the health care unit in each facility, but it determined that the unit administrators' participation in the direction, evaluation, and discipline of Wexford employees was minimal and that those activities were performed in their capacity as monitors of the vendor contract and in order to ensure compliance therewith. The Board found that the provision requiring unit administrators to sign off on evaluations and compensatory time had "purely contractual consequences." The Board concluded that the unit administrators' limited involvement did not support a finding that the DOC was responsible for the direction and evaluation of Wexford employees.

A third factor was employee discipline. The Board concluded that Wexford, rather than the DOC, controlled Wexford employee-discipline issues. The Board acknowledged that DOC unit administrators reported misconduct by Wexford employees and recommended discipline, but it found that the DOC's participation was limited and that the ultimate decision on discipline was left to Wexford supervisors. The Board found that the DOC's purported control of Wexford employee discharges was limited to the issuance of a stop order, which prevents individuals who are deemed a security risk from entering DOC facilities. Referencing a provision of the collective bargaining agreement between the Union and Wexford, the Board noted that the issuance of a stop order did not result in a discharge but, rather, a suspension without pay, pending an investigation and a grievance process. The Board also noted that Wexford was free to assign the employee to a non-DOC facility in which Wexford provides services.

The final factor was compensation. The Board concluded that Wexford alone determined the wage-and-benefits packages it would offer to its employees. The Board noted that the DOC contractually

agreed to pay Wexford a sum certain for the health care services pursuant to a negotiated budget schedule and that the schedule detailed the amount the DOC would pay for each position in the health care unit. The Board pointed out that the vendor contract did not require Wexford to pay its employees according to that schedule and did not limit Wexford's discretion to compensate its employees. The Board found that the DOC was a source of the funds used to compensate Wexford employees but that it has no authority to control how those funds were allocated.

In its arguments to the Board, the Union claimed that an entity's possession of the authority to exercise significant control over workers at any time makes the entity necessary to the collective bargaining process and therefore an employer within the meaning of the Act. The Board responded to that argument in a lengthy footnote. The Board found that the vendor contracts fail to define "in any comprehensible manner" the specific authority that the DOC reserved. The Board then looked to the parties' practice and intentions under the contract and determined that the DOC had little, if any, actual say in the hiring, direction, discipline, and discharge of Wexford employees and that the parties did not intend that the DOC participate in any significant way in the establishment and control of the Wexford employees' terms and conditions of employment. The Board concluded that the DOC exercises "nothing more than a mere perfunctory review and oversight of the vendor contract and the Wexford employees' employment conditions."

## II. ISSUES AND ANALYSIS

The initial issue on review is the propriety of the Board's finding that the DOC is not an employer of the Wexford employees who work at DOC facilities. Judicial review of an agency's decisions is governed by the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 2000)). 5 ILCS 315/11(e) (West 2000); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 301-02 (1998). In this case, the facts are not in dispute, and the issue involves an examination of the legal effect of a given set of facts. For that reason, a "clearly erroneous" standard of review is applied. *City of Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302.

In this case, Wexford's status as an employer is undisputed. That Wexford is an employer does not preclude a finding that the DOC is also an employer of the Wexford employees who work in the health care units of the correctional facilities. The test for the existence of joint employers is "whether 'two or more employers exert significant control over the same employees—where from the evidence

it can be shown that they share or co[ ]determine those matters governing essential terms and conditions of employment.' " *Orenic v. Illinois State Labor Relations Board*, 127 Ill. 2d 453, 474, 537 N.E.2d 784, 794 (1989), quoting *National Labor Relations Board v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982). Factors relevant to the determination of joint employers include the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline and the actual day-to-day supervision and direction of employees on the job (*Orenic*, 127 Ill. 2d at 475, 537 N.E.2d at 794-95); and the authority to tax and raise funds and to approve budgets and grant financing (*County of Kane v. Illinois State Labor Relations Board*, 165 Ill. App. 3d 614, 518 N.E.2d 1339 (1988)). The key consideration in determining employer status is the extent to which an entity is necessary to create an effective bargaining relationship. *Village of Winfield v. Illinois State Labor Relations Board*, 176 Ill. 2d 54, 60, 678 N.E.2d 1041, 1044 (1997).

The evidence in the record shows that both Wexford and the DOC exert significant control over the terms and conditions of employment, the hiring and continuation of employment, and the supervision, direction, evaluation, and discipline of the Wexford employees. It is clear that Wexford establishes salary and pension benefits for its employees, but compensation is just one matter subject to collective bargaining. According to the vendor contract, the DOC establishes an annual amount to be paid for Wexford's services, and this amount includes a sum budgeted for each staff position in the health care unit. The amount of available funding has at least an indirect effect on bargaining over wages and benefits. See *City of Rockford v. Illinois State Labor Relations Board*, 158 Ill. App. 3d 166, 173, 512 N.E.2d 100, 104 (1987). According to the contract, the DOC dictates the number and type of health care positions that compose its health care units, the number of shifts for each position, and the hours for each shift, while Wexford determines whether each position is filled by part-time or full-time employees. According to the contract, the DOC mandates the minimum qualifications for each position, and only the DOC can grant an exemption from one or more of those qualifications. While Wexford interviews and makes the final offer of employment to an applicant, the final selection of an employee is subject to the DOC's approval. Additionally, approved applicants must attend the DOC's training academy.

The vendor contract requires the DOC unit administrator to participate in the evaluations of Wexford employees and to monitor the employees in terms of work performance, compliance with DOC

directives, and the maintenance of medical records and time records. The unit administrator issues memos and conducts staff meetings to instruct and update Wexford employees regarding the DOC's directives. The contract requires the unit administrator to approve requests for personal time and for compensatory time in lieu of overtime pay. Though the contract requires unit administrators to notify Wexford supervisors of violations or problems and to recommend that the employee be disciplined, it does not provide a due process mechanism by which Wexford or the employee can directly challenge the unit administrator's assessment. The contract authorizes the DOC to issue stop orders, which effectively ban the subject employees from all DOC facilities, but it provides no due process mechanism to directly challenge the DOC's decision. The Board correctly noted that the issuance of a stop order does not result in an immediate termination, but it overlooked the fact that it does result in an immediate, unpaid suspension. In a case where Wexford determines that the stop order was improper but the DOC refuses to recall it, the employee has lost potential employment at every DOC facility. Under the contract, the continued employment of staff is subject to the DOC's approval. The factors that lead to an approval or disapproval are not defined in the contract. Again, there is no mechanism by which Wexford or the employee can challenge the DOC's decision not to approve continued employment.

The evidence in the record demonstrates that the DOC possesses and exercises significant control over the supervision, retention, and discipline of Wexford employees. The Board's conclusion that the DOC's role is limited to oversight to ensure compliance with the vendor contract is not supported by the record and is clearly erroneous.

In the collective bargaining agreement between the Union and Wexford, both parties recognize that there are some specific terms and conditions of employment which are under the control of the DOC and which are important and proper subjects of collective bargaining. For example, the Union and Wexford agree that the Union should have an opportunity to designate an employee representative or representatives to serve on each DOC facility's Safety Committee, Labor/Management Committee, and Health Care Unit Quality Assurance Committee and that the DOC should provide Wexford employees with some type of due process hearing in the event the DOC revokes an employee's security clearance. The record demonstrates that the DOC has experience negotiating these types of issues and that they are subjects included in collective bargaining agreements that the DOC has entered into with similar bargaining units. The DOC's possession

and exercise of control over certain conditions of employment and issues regarding health and safety directly impact the Wexford employees in the performance of their duties and therefore make it an entity necessary to the collective bargaining process.

■ The evidence in the record indicates that the DOC and Wexford are joint employers who share authority over the training, retention, daily direction, rules compliance, discipline, and discharge of employees and that each exercises significant control over the same employees. See *Orenic*, 127 Ill. 2d at 475, 537 N.E.2d at 794-95; *Elmhurst Park District, Employer & Service Employees International Union, Local #73*, 16 Pub. Employee Rep. (Ill.) par. 2042, No. S—RC—00—097 (ISLRB August 30, 2000). The DOC is an employer under the Act, and the Board's decision to dismiss the certification petition and the unfair labor practices charge was clearly erroneous.

In its brief on appeal, Wexford has argued that the Board lacks jurisdiction under federal preemption principles. The Board has not had the opportunity to consider this issue, and therefore we remand these cases to the Board for further proceedings.

## III. CONCLUSION

Accordingly, we reverse the decision of the Board and remand the cases to the Board for further consideration.

Reversed; cases remanded.

GOLDENHERSH and HOPKINS, JJ., concur.