(No. 99074.—

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 31, Appellee, v. THE ILLINOIS STATE LABOR RELATIONS BOARD, STATE PANEL, *et al.* (The Department of Central Management Services *et al.*, Appellants).

*Opinion filed October 6, 2005.*

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Paul Racette, Assistant Attorney General, of Chicago, of counsel), for appellant Department of Central Management Services.

Robert E. Arroyo, Brian D. McCarthy and Shannon M. Callahan, of Chicago, and Edward M. Cherof and Jonathan J. Spitz, of Atlanta, Georgia, all of Jackson Lewis, L.L.P., for appellant Wexford Health Sources, Inc.

Gilbert Feldman, of Cornfield & Feldman, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

This case arises from a decision of the Illinois State Labor Relations Board, State Panel (Board), dismissing a certification petition and a related unfair labor practice claim filed by the American Federation of State, County, and Municipal Employees, Council 31 (AFSCME). The appellate court, on administrative review, set aside the Board's decision. 351 Ill. App. 3d 707. We granted leave to appeal (177 Ill. 2d R. 315) and now reverse the judgment of the appellate court.

## BACKGROUND

The Illinois Department of Corrections (DOC) is required by law to provide medical care to the inmates incarcerated in its facilities. By law, it may do so by contracting with private vendors. In choosing a vendor, the DOC requests bids which are ranked according to cost and other factors. The contract is awarded to the vendor whose bid is ultimately selected.

Pursuant to this process, the DOC has contracted with three private vendors to provide medical services at 34 correctional facilities. Wexford Health Sources, Inc. (Wexford), is one such vendor and provides medical services at 19 DOC facilities. Wexford is a private corporation based in Pennsylvania that employs health-care workers and assigns them to health-care facilities in 11 states, including units located in Illinois.

The contracts between the DOC and Wexford[1] identify Wexford as an independent contractor and provide that neither Wexford nor its employees are agents of the DOC. According to the contracts, Wexford is solely responsible for the negligent acts of its employees, and Wexford is to hold the DOC harmless from any suits or claims arising from the negligence or misconduct of Wexford employees. Under the terms of the contracts, the DOC prepays the contract amount to Wexford and then throughout the course of the year, Wexford and the DOC conduct a reconciliation process, making adjustments to the amount paid whenever necessary.

Pursuant to procedures under the National Labor

---

[1]Wexford and the DOC have separate vendor contracts for each DOC facility. The general provisions of the contracts are the same, but each contract sets forth the particularized staffing needs of each facility. For example, a contract might state that Wexford must provide a certain type of medical worker for 30 hours per week in a given facility. Wexford chooses how to staff the position, whether it be with one full-time employee or two part-time employees who work 15 hours a week.

Relations Act (29 U.S.C. § 151 *et seq.* (2000)), AFSCME became the exclusive bargaining representative of Wexford's bargaining unit employees in 1997. Subsequently, AFSCME and Wexford negotiated a collective-bargaining agreement covering most, but not all, of the Wexford employees.[2] Wexford employs approximately 375 individuals at the Illinois facilities it services, of which approximately 275 to 280 are members of AFSCME. The DOC was not represented at any of the negotiations, nor is it a party to the collective-bargaining agreement. The collective-bargaining agreement between AFSCME and Wexford outlines a grievance procedure for employees and addresses issues such as the appointment of Wexford employees to various DOC committees. The agreement also covers employees' hours of work, temporary assignments, seniority, layoff and recall, vacancies, leaves of absence, discipline, personnel files, evaluation, terminations, personal time off, wages, and benefits.

On November 27, 2000, AFSCME filed a representation/certification petition with the Board. In the petition, AFSCME noted that the DOC is a public employer under the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2000)). AFSCME sought to represent, under that Act, certain employees of Wexford, who work at the DOC facilities. AFSCME admitted that it already represented these same employees under the National Labor Relations Act, and that a collective-bargaining agreement existed between them. AFSCME contended, however, that the DOC was a joint employer of these employees. Also on that same date, AFSCME filed an unfair labor practice charge with the Board against Wexford, alleging that a registered nurse had

---

[2]Another union, the International Brotherhood of Electrical Workers, represents Wexford's bargaining unit employees under the National Labor Relations Act at the Shawnee Correctional Center.

been suspended by Wexford because of her position as a union officer. AFSCME sought rescission of the suspension and requested that the employee be made whole.

Wexford subsequently filed motions to intervene and to dismiss, arguing, *inter alia*, that the National Labor Relations Act preempted the Board's jurisdiction. The Illinois Department of Central Management Services (CMS), which represents the state in labor-related issues, also filed a motion to dismiss. CMS also argued, among other things, that federal preemption deprived the Board of jurisdiction.

The Board allowed Wexford's motion to intervene, but it denied both motions to dismiss based on federal preemption. The Board held that a hearing before one of its administrative law judges (ALJ) was necessary in order to determine whether the DOC is a joint employer of the employees involved. Further, the Board held that, if it determined that the DOC was a joint employer, the Board would then file a petition with the National Labor Relations Board asking whether the Board's assertion of jurisdiction would violate principles of federal preemption.

At the hearing, extensive testimony was offered by the parties regarding the degree of control which Wexford exercised over its employees. At the conclusion of the hearing, the ALJ issued a recommended decision and order. Based on the evidence, the ALJ found that the DOC did not control and was not involved in the recruiting or hiring of Wexford's employees. Nor does the DOC control Wexford employees' wages, benefits, paid time off, overtime, scheduling, and termination. Further, although Wexford employees are subject to the DOC's security regulations, the ALJ ruled that those regulations did not constitute "control" for purposes of imposing employer status on the DOC. In light of all of these factors, the ALJ concluded that the DOC was not a joint

employer of the Wexford bargaining unit employees. The ALJ further reasoned that the state's presence at the bargaining table was not necessary to establish an effective bargaining relationship, noting that Wexford and AFSCME had entered into a collective-bargaining agreement under federal law. Accordingly, the ALJ recommended that the Board dismiss the representation/ certification petition. Several weeks later, the Board's executive director dismissed the unfair labor practice charge regarding the registered nurse. The director believed that the clear implication of the ALJ's recommended order was that the Wexford employees were not public employees. The director maintained that if the Board concluded that the ALJ's recommended order did not resolve the issue of whether the nurse was a public employee, the charge should be set for a hearing.

AFSCME appealed the dismissal of the unfair labor practice charge to the Board, contending that the action was premature in that the Board might not accept the ALJ's recommended decision and order. AFSCME also filed exceptions to the ALJ's recommended decision. Wexford and CMS filed responses to those exceptions.

On August 12, 2002, the Board issued its decision and order, in which it agreed with the ALJ's recommendations. Specifically, the Board found that the DOC exercised "little meaningful control over any aspect of the employment of the Wexford bargaining unit employees," including hiring, instruction, evaluation, wages, benefits, and overall direction. Accordingly, the Board dismissed AFSCME's representation/certification petition and affirmed the Director's dismissal of the related unfair labor practice charge.

Thereafter, AFSCME filed a petition for direct administrative review of the Board's decision and order in the appellate court. The court set aside the Board's decision, concluding that the Board clearly erred in find-

ing that the DOC was not a joint employer of the Wexford employees. According to the appellate court, the record evidence "demonstrates that the DOC possesses and exercises significant control over the supervision, retention, and discipline of Wexford employees. The Board's conclusion that the DOC's role is limited to oversight to ensure compliance with the vendor contract is not supported by the record ***." 351 Ill. App. 3d at 716. Rather, the court held that the DOC and Wexford were joint employers who share authority over the training, retention, daily direction, rules compliance, discipline, and discharge of employees. 351 Ill. App. 3d at 717. CMS,[3] on behalf of the DOC, thereafter petitioned this court for leave to appeal, which we allowed. See 177 Ill. 2d R. 315. Additional pertinent facts will be discussed further in the context of our analysis of the issues.

## ANALYSIS

As an initial matter, Wexford maintains in its brief that this matter has been preempted by federal law, specifically the National Labor Relations Act (National Act). Wexford points out that AFSCME, in this action, is attempting to organize a group of employees that it acknowledges is already covered by a collective-bargaining agreement negotiated under the National Act. Put another way, AFSCME seeks the right to bargain with two employers, a private company and a state governmental agency, under two different labor relations statutes with respect to one group of employees. As such, AFSCME is asking to be the employees' sole bargaining representative under our state labor relations act just as it already is under the National Act. Wexford maintains that such simultaneous or concurrent jurisdiction has never been recognized by any agency or judicial opinion.

---

[3]CMS has continued to represent the DOC on administrative review of the Board's actions.

As noted earlier, both Wexford and CMS raised this very issue before the Board by way of a motion to dismiss. The Board denied the motion because it was not clear that its jurisdiction was preempted. To that end, the Board ordered that a hearing be held in order to determine whether the employees at issue were, in fact, joint employees of the DOC under the Illinois act. The Board further indicated that if it were to find that a joint employer relationship existed between Wexford and the DOC, the Board would then petition the National Labor Relations Board for an advisory opinion as to whether the joint employer status, as contemplated in this case, would violate principles of federal preemption. However, at the conclusion of the hearing, the Board concluded that the DOC was not an employer of the petitioned-for employees under the Illinois act and that it lacked jurisdiction over the matter.

In its brief, CMS has not iterated its previous arguments made before the Board with respect to preemption. CMS, represented by the Attorney General, maintains that the issue need not be addressed in resolving this appeal. Indeed, at oral argument in this case, all of the parties agreed, including Wexford, that this court need not address the question of federal preemption because if the appellate court's conclusion that the DOC is a joint employer were to be upheld, the Board would seek an advisory opinion from the National Labor Relations Board on the matter. See 29 C.F.R. pt. 100, § 101.39 (2003).

Thus, while we believe that the question of whether it is possible for both the Board and the National Labor Relations Board to assert concurrent jurisdiction over a single group of employees is both novel and interesting, given the arguments and representations of the parties at oral argument, we decline to address the issue of federal preemption. We therefore proceed to the question

of whether the Board's decision, that the DOC is not a joint employer of the petitioned-for employees, should be confirmed.

Judicial review of a decision of the Board is governed by the Administrative Review Law. See 5 ILCS 315/11(e) (West 2000); 735 ILCS 5/3—101 *et seq.* (West 2000). Under the Administrative Review Law, the scope of judicial review extends to all questions of law and fact presented by the record before the court. 735 ILCS 5/3—110 (West 2000). The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). Questions of law are reviewed *de novo. Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). An agency's findings and conclusions on questions of fact shall, by statute, "be held to be prima facie true and correct." 735 ILCS 5/3—110 (West 2000); *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). As such, when a court is reviewing an agency's factual findings, it will not reweigh the evidence nor will it substitute its judgment for that of the agency. Rather, the court will ascertain only if the findings of fact are against the manifest weight of the evidence. *City of Belvidere*, 181 Ill. 2d at 204. Mixed questions of fact and law are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982). Mixed questions of fact and law are subject to reversal only when deemed "clearly erroneous." *AFM Messenger*, 198 Ill. 2d at 395. A decision is "clearly erroneous" when the

reviewing court is left with the definite and firm conviction that a mistake has been committed. *AFM Messenger*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

The question of whether the DOC is a joint employer under the Illinois Public Labor Relations Act is a mixed question of law and fact. The parties are not in dispute as to the DOC's involvement in matters such as recruitment, hiring, training, wages, benefits, scheduling, direction, evaluation, discipline, and discharge. The only question is whether, given these facts, the DOC is a joint employer of the Wexford employees under the Illinois Labor Relations Act. Thus, we review the Board's decision under the clearly erroneous standard noted above.

AFSCME maintains that the Board erred by overlooking the significant amount of control the DOC has retained for itself over the terms and conditions of the Wexford employees' employment. Citing to both federal and state labor relations cases, AFSCME argues that it is the DOC's theoretical, indirect control over the terms and conditions of employment and not its actual exercise of (or lack thereof) control over those terms and conditions that is dispositive. We disagree.

Contrary to AFSCME's contentions, joint employer status does not turn on theoretical control over the terms and conditions of employment. In *Village of Winfield v. Illinois State Labor Relations Board*, 176 Ill. 2d 54, 60 (1997), this court considered whether two entities were joint employers under the Illinois Labor Relations Act. In so doing, we enunciated the following test to be used when undertaking a joint employer assessment:

"The test for the existence of joint employers is whether ' "two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." ' *Orenic v.*

*Illinois State Labor Relations Board*, 127 Ill. 2d 453, 474 (1989), quoting *National Labor Relations Board v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982). Relevant factors to consider in making this determination include the 'putative joint employer's role in "hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." ' *Orenic*, 127 Ill. 2d at 475, quoting J. Jansonius, *Use and Misuse of Employee Leasing*, 36 Lab. L.J. 35, 36 (1985). An important consideration in determining whether a particular entity is an employer is the extent to which that entity is necessary to create an effective bargaining relationship." *Village of Winfield*, 176 Ill. 2d at 60.

We note that the above citation reveals that the standard set forth in *Winfield* was predicated upon the same standard utilized under federal law with respect to joint employer status. This is so because, in labor cases, "the rulings of the National Labor Relations Board (NLRB) and the Federal courts when these bodies construe the National Labor Relations Act are persuasive authority for similar provisions in the State Act." *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 264 (1989).

The test enunciated in *Winfield* remains consistent with that utilized in federal cases addressing joint employer status. Indeed, the National Labor Relations Board has recently noted:

"[T]he Board's test for determining whether two separate entities should be considered to be joint employers with respect to a specific group of employees has been a matter of settled law for approximately 20 years. In determining whether a joint employer relationship exists under this test, the Board analyzes whether putative joint employers share or co-determine those matters governing essential terms and conditions of employment. See, e.g., *Texas World Service Co. v. NLRB*, 928 F.2d 1426, 1432 (5th Cir. 1991);

*NLRB v. Browning-Ferris Industry*, 691 F.2d 1117, 1124 (3rd Cir. 1982); *TLI, Inc.*, 271 NLRB 798 (1984), enfd. mem. 772 F.2d 894 (3d Cir. 1985). The essential element in this analysis is whether a putative joint employer's control over employment matters is direct and immediate. *TLI, Inc.*, 271 NLRB at 798-799.

Thus, approximately 20 years ago, the Board, with court approval, abandoned its previous test in this area, which had focused on a putative's joint employer's *indirect* control over matters relating to the employment relationship." *Airborne Freight Co.*, 338 N.L.R.B. 597, 597 n.1 (2002). Thus, under federal law, theoretical control is not dispositive to the determination of joint employer status.

We further note that the state labor decisions cited by AFSCME in support of its theoretical-control argument, specifically *Elmhurst Park District*, 16 Pub. Employee Rep. (Ill.) par. 2042, No. S—RC—00—097 (ISLRB General Counsel August 30, 2000), do not compel a departure from the above principles. According to AFSCME, *Elmhurst* stands as authority for the proposition that the *theoretical control which an entity may exercise* should be the standard which is used to determine whether it is a joint employer rather than the *actual control which it does exercise*. We have reviewed *Elmhurst*, however, and find it inapposite. *Elmhurst* involved an entity, the Sugar Creek Golf Course, which was created by an intergovernmental agreement between two public bodies, the Village of Villa Park and the Elmhurst Park District. The Board noted that "the terms of that agreement are critical in deciding what public body has authority as a public employer over the employees of that entity." Thus, in assessing which public body employed the people who worked at the Sugar Creek Golf Course, the Board looked to the language of the intergovernmental agreement which specifically defined that reserved authority. In this case, there is no intergovernmental agreement. Rather, there are only vendor contracts between a public entity and a private company.

Moreover, unlike the intergovernmental agreement in *Elmhurst*, which created the specific entity by which the petitioned-for employees are employed, the vendor contracts here did not create Wexford. Given these critical distinctions, we cannot agree with AFSCME's assertion that *Elmhurst* controls the resolution of the instant case.

In light of the above, we are convinced that the Board in this case employed the correct legal standard to assess whether the DOC was a joint employer of the Wexford employees. Accordingly, we turn our analysis to the question of whether the Board's conclusion that the DOC was not a joint employer is clearly erroneous.

In this case, the ALJ found, and the Board agreed, that Wexford's control over matters governing the essential terms and conditions of employment was direct and substantial and that the DOC's involvement did not rise to the level of sharing meaningful control. We agree and do not believe that the Board's decision was clearly erroneous. Uncontroverted facts entered into evidence at the Board hearing included consideration of all of the relevant terms and conditions of employment, which we address in turn.

With respect to hiring, Wendy Milner, Wexford's director of Human Resources in Risk Management, testified that the DOC has no control or involvement in the recruitment and hiring of Wexford employees. Wexford solely assesses its recruiting needs, identifies candidates, accepts applications and resumes, and conducts interviews. Wexford then makes the hiring decision without consultation with or any input from the DOC. Although testimony revealed that the DOC does conduct a background check of Wexford employees, such a check exists for security purposes only and is unrelated to hiring considerations made by Wexford. The background check is required of all DOC employees, contract employees,

consultants, interns, volunteers and anyone allowed regular access to a DOC facility.

Another term and condition of employment is wages. Theodore R. Sucher III, Wexford's executive vice president for operations, testified that the wages paid to Wexford employees are the result of negotiations memorialized in the binding collective-bargaining agreement between Wexford and AFSCME. Although the vendor contracts between Wexford and the DOC are based upon a certain hourly rate for each staff position, it is done so to calculate the total amount of compensation to be provided to Wexford under their vendor contract. It does not bind Wexford to adhere to those calculations in deciding what to pay its own employees. Rather, Wexford is bound by the terms of its collective-bargaining agreement with AFSCME. Evidence established at the hearing revealed that those wages can and do differ from the rates delineated in the vendor contracts. Additionally, pursuant to the collective-bargaining agreement between AFSCME and Wexford, Wexford employees are paid time and one-half after 40 hours in any given week or after eight hours in any given day. Sucher also testified that overtime must be approved by a Wexford manager. The DOC may or may not reimburse Wexford partially for such overtime depending on the circumstances and pursuant to the terms of the vendor contracts with Wexford. Whether the DOC selectively decides to reimburse Wexford, Wexford is bound legally and under the terms of its agreement with AFSCME to pay the employees such overtime. Given this evidence, we cannot say that the Board clearly erred in finding that the DOC had little meaningful control over this particular term of employment.

Another example of the exclusivity of Wexford's control over its employees is found in paid-time-off requests. Milner testified that, in order to use one's paid

time off, an employee submits a request slip which is reviewed for approval by a Wexford on-site manager or regional manager. If approved, a copy of the request is then provided to the "Health Care Unit Administrator" (HCUA). The HCUA is a DOC employee whose role is to facilitate management of the vendor contracts by monitoring compliance with the contract and assuring safety of the unit. The HCUA may make a *recommendation* to the Wexford manager concerning the operational needs of the facility, but he or she has *no authority* to approve or deny a paid-time-off request. There have been occasions when concerns have been raised by the HCUA about operational needs, but the Wexford manager has approved the paid-time-off request nonetheless. Milner averred that Wexford's paid-time-off provisions are distinctly different from the paid-time-off provisions offered by the DOC to its employees.

With respect to performance evaluations, the record reflects that such evaluations are conducted by Wexford managers. These evaluations are recorded on a standard Wexford evaluation sheet which is different from the evaluation sheet used by the DOC for its employees. The original evaluation is forwarded to Wexford's main office in Pittsburgh, a copy is placed in the local facility's file and a copy is given to the employee for retention. Milner testified that once the evaluation is completed, it is forwarded to the HCUA for signature. According to Milner, the purpose for the HCUA signature is simply to demonstrate to the DOC that Wexford is satisfying the terms of the vendor contract by ensuring premium care. On rare occasions, particularly where there is no on-site Wexford supervisor, an HCUA may provide input into the evaluation. However, this input may or may not be incorporated into the formal evaluation based on Wexford's judgment and does not affect an employee's wages. The record therefore supports the Board's conclusion

that the DOC had little meaningful control over this particular condition of employment.

Discipline is another relevant term and condition of employment. According to the testimony of Susan Walker, regional manager of Wexford and formerly an HCUA with the State of Illinois, Wexford employees are subject to Wexford rules and regulations under its "Code of Conduct" contained in the employee handbook. Violation of any of the 31 listed items subjects an employee to the company's progressive discipline system. The process and any resulting disciplinary measures which are taken are initiated and ultimately decided by Wexford supervisors or managers. Disciplinary issues may be raised by an HCUA or medical director, but they are directed to the Wexford officials who then determine an appropriate course of action. All discipline issued by Wexford between January 2000 and the date of the hearing (approximately 100 occasions) was the independent decision of Wexford, not the DOC. In fact, testimony revealed that DOC employees do not have the authority to discipline any Wexford employees. In light of this evidence, we cannot say the Board clearly erred in finding that the DOC had little meaningful control over discipline.

We note at this juncture that both the appellate court and AFSCME put emphasis on the HCUA's involvement with Wexford employees in matters such as the paid-time-off and disciplinary measures as an example of joint employer control in that the DOC is responsible for the day-to-day direction of Wexford employees. In contrast, the Board ruled that the HCUA's participation in these activities was limited solely to their capacity as a monitor of the vendor contract between the DOC and Wexford and to ensure compliance therewith. In so ruling, the Board relied on its previous decision, *Illinois Departments of Central Management Services & Corrections*, 4 Pub. Employee Rep. (Ill.), par. 2034, No. S—CA—100

(ISLRB July 20, 1988), where it held that such operational controls go to the issue of contract compliance as opposed to control over the essential terms and conditions of employment. We agree and note that the Board's approach to this question is consistent with that of the National Labor Relations Board in similar circumstances. For example, in *Local 254, Service Employees International Union*, 324 N.L.R.B. 743 (1997), the National Board found that the direct supervision by the putative joint employer over the employees for purposes of "assuring that it received contracted services" was not sufficient to impose a joint employer status. *Local 254, Service Employees International Union*, 32 N.L.R.B. at 748. The Board, in our view, did not clearly err in characterizing the HCUAs' involvement as being one related to mere contractual compliance as opposed to control over the day-to-day direction of the Wexford employees.

Further testimony at the hearing by Thomas Page, deputy director of the DOC, revealed that wardens at any of the DOC facilities have the authority to issue a "stop order" barring an individual from access to that facility. Stop orders are typically issued by the warden anytime he or she determines that any individual poses a threat to the security or safety of the facility or an inmate. It applies to anyone entering the facility, including visitors, employees, volunteers, chaplains, vendors or contract employees. According to the testimony of Sucher, in the event that a stop order is issued against a Wexford employee, Wexford officials decide whether, in their view, it was an appropriate action and may petition the DOC to reverse its decision. A stop order is not tantamount to a discharge. In the event that the DOC does not remove the stop order, Wexford may offer the employee a position at one of its other non-DOC facilities. Article XV of the collective-bargaining agreement between Wexford

and AFSCME specifically provides that a stop order does not automatically result in termination until an investigation and hearing have been conducted pursuant to the grievance provisions under the terms of their collective-bargaining agreement. Although AFSCME contends that the warden's power to issue a stop order is tantamount to control over firing, evidence at the hearing established that Wexford has the sole ability to discharge any of its employees without input or approval from the DOC. The state cannot and has never discharged a Wexford employee.

Notwithstanding the above evidence, both AFSCME and the appellate court assign great weight to the warden's power to issue a stop order and equate it with control over termination, which both maintain raises the DOC to the level of joint employer. We disagree.

In rejecting this argument, the Board cited to its previous decision in *Illinois Department of Central Management Services & Corrections*, 4 Pub. Employee Rep. (Ill.) par. 2034, in which it refused to equate the denial of access to a prison for security purposes with discharge from employment. We do not believe the Board erred in this respect. Indeed, the Board's approach to this question, *i.e.*, whether the ability to enforce prison security rules renders a prison the employer of those who fall within the ambit of the security directive, finds support in judicial opinions where the ability to deny access to a prison has been claimed to render a prison an employer. For example, in her recommended decision and order, the ALJ cited the opinion of *Hojnacki v. Klein-Acosta*, No. 00 C 1356, 3095 (N.D. Ill. 2001). There, the plaintiff was an employee of a private company that contracted services to the DOC. The court held that the State was not plaintiff's employer for purposes of her Title VII claims. Relevant to this issue in this case is the court's conclusion that "[t]he fact that Hojnacki (contract

employee) was subject to the prison's security regulations *** does not make her an employee of the DOC." *Hojnacki*, slip op. at 13. The court acknowledged that although "valid penological measures imposed to ensure safety and security within a facility may require a worker to fulfill certain conditions, those conditions do not rise to the level of 'control' for purposes of determining a worker's employment status with the correctional facility itself." On appeal, the United States Court of Appeals for the Seventh Circuit affirmed, stating "one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002), quoting *Equal Employment Opportunity Comm'n v. North Knox School Corp.*, 154 F.3d 744, 748 (7th Cir. 1998).

Similarly, in *Lambertsen v. Utah Department of Corrections*, 79 F.3d 1024 (10th Cir. 1996), the Tenth Circuit Court of Appeals recognized the unique circumstances of a private employee working in a penal institution. The case involved a teacher's assistant working for an independent contractor (a school district) within the Utah Department of Corrections. The court refused to characterize the Utah Department of Corrections as an employer because the Department only controlled aspects of prison security while the school district controlled the hiring, firing, wages and benefits of school employees who were assigned to the prison school.

Although the Department exercised some control over the plaintiff for security purposes when she was within the confines of the prison, the ultimate control over her employment was exercised by the school district. In other words, there was no basis to find that the Department

controlled the means or the manner in which the plaintiff performed her day-to-day work. *Lambertsen*, 79 F.3d at 1029.

We agree with the reasoning outlined in the above federal cases and hold that the Board did not clearly err in finding that the control that DOC may exert over Wexford employees with respect to prison security and safety does not rise to the level of "control" for purposes of determining employer status under the Illinois Labor Relations Act. After reviewing the evidence adduced at the hearing, we cannot say the Board clearly erred in determining that the stop-order situation was merely authority which each facility reserves purely for security purposes and not for employment purposes. The record establishes, according to the testimony of Page, that stop orders apply to everyone entering the facility, including visitors, employees, volunteers, chaplains, vendors or contract employees. In the only two specific instances cited by AFSCME in its brief and corroborated by the record, one involved the revocation of an employee's security clearance on two occasions because she did not meet the requisite licensing requirements of the state for a psychologist. Although the DOC was persuaded to waive the requirement for this employee after the first stop order, it chose to discontinue the waiver a second time due to an incident related to her performance. It was then that Wexford discharged the employee, not the DOC, after notice and a hearing, in accordance with the grievance procedures outlined in Wexford's collective-bargaining agreement with AFSCME. The second instance cited by AFSCME involved an employee who failed a required drug test. Again, after notice and a hearing, Wexford made an offer to the employee to allow her to resign. The offer was rejected, so she was discharged by Wexford, not the DOC.

After carefully reviewing all of the evidence adduced,

we cannot say that the Board clearly erred in ruling that the Wexford employees were not jointly employed by the DOC. With respect to hiring and firing, promotions, and demotions, setting wages, work hours, discipline, and actual day-to-day supervision and direction of employees on the job, the evidence supports the Board's finding that the DOC did not share or codetermine control over these matters so as to be considered a joint employer. Moreover, we agree with the sentiment expressed by the Board at the conclusion of its written decision:

> "The Board's lack of jurisdiction over [the Wexford] employees does not completely remove them from the purview of collective bargaining. Rather, it simply removes them from the jurisdiction of the [Illinois State Labor Relations] Act. However, these employees are currently represented by AFSCME and are covered by the [National Labor Relations Act]. They are thus not in the collective bargaining 'no-man's land' in which many subcontracted employees of a public sector entity find themselves. *** On the contrary, the petitioned for employees possess the rights guaranteed by the National Labor Relations Act and may enforce those rights at the National Labor Relations Board. Thus, AFSCME may seek redress for any disruption or potential unfair labor practice in its bargaining relationship with Wexford from the National Labor Relations Board. That is, if Wexford has relied on its connection with the State to justify an alleged refusal to bargain over certain terms and conditions of employment, or if AFSCME has been unable to process grievances under the collective bargaining agreement's grievance procedure because the State has denied its stewards access to the employees workplaces, AFSCME can pursue resolution of those matters with the National Labor Relations Board pursuant to the National Labor Relations Act's unfair labor practice provisions."

It is clear from the record that the DOC has little meaningful control over the conditions and terms of the Wexford employees' employment. The Board did not err in reaching this conclusion, and its decision on this matter should not be disturbed.

In light of our resolution of the joint employer status question, the Board's dismissal of the related unfair labor practice charge was correct.

## CONCLUSION

The Board's determination that the DOC is not a joint employer of the Wexford bargaining unit employees was not clearly erroneous. For the foregoing reasons, the judgment of the appellate court is reversed and the decision of the Board is confirmed.

*Appellate court judgment reversed;*
*Board order confirmed.*