Docket No. 108785.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

———————————

SPEED DISTRICT 802, a/k/a Governing Board of Special Education Joint Agreement District 802, Appellant, v. RACHEL WARNING *et al.*, Appellees.

*Opinion filed February 25, 2011.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices Thomas, Garman, and Karmeier concurred in the judgment and opinion.

Chief Justice Kilbride dissented, with opinion.

Justice Freeman dissented, with opinion, joined by Justice Theis.

## OPINION

On January 8, 2008, the Illinois Educational Labor Relations Board (IELRB or the Board) issued a decision, finding that SPEED District 802 (the District) violated section 14(a)(3) and, derivatively, section 14(a)(1), of the Illinois Educational Labor Relations Act (115 ILCS 5/14(a)(1), (a)(3) (West 2004)), when it failed to renew the teaching contract of Rachel Warning (Warning), a nontenured probationary teacher, at the end of the 2004-05 school year. The decision of the Board was affirmed in a divided opinion by the appellate court. See 392 Ill. App. 3d 628. We granted the District's petition for leave to appeal and now set aside the Board's decision and reverse the appellate court judgment.

BACKGROUND

The following facts are taken from the record and transcripts of the hearing before the administrative law judge.

Warning began working as a special education teacher for SPEED District 802 in the 2001-02 school year and was assigned to teach a class of severely physically handicapped teenage students. With regard to this first school year, Warning's personnel file contains only Warning's annual evaluation, which shows she received an overall rating of "Standard."[1]

During the following 2002-03 school year, however, a number of concerns surfaced regarding Warning's performance. Warning's personnel file contains a letter of reprimand, dated October 2, 2002, indicating that Warning was admonished for failing to notify the principal or other administrator before she sent a teaching assistant home due to his misconduct. Warning was advised that she did not have the authority to take this type of disciplinary action on her own and, in doing so, her actions denied the administration the opportunity to assess and document the situation firsthand.

Although Warning again received an overall rating of "Standard" in her annual evaluation, dated January 31, 2003, she received a number of "unsatisfactory" ratings in individual performance objectives, as well as some "excellent" ratings and comments. The objectives in which she received poor ratings were: "Effectively manages the instructional team," "Interacts effectively with co-workers," and "Exhibits professionalism and is a role model for other teachers and students." In the recommendation section of the evaluation form, Principal Call wrote:

> "When it comes to the personnel working using a trans-disciplinary approach, that is not evident through many different observations. We have discussed concerns with the support staff regarding a comfort level in the classroom.
>
> * * *
>
> Your relationships with your classroom staff have been negative and strained this year. Earlier in the (school) year

---

[1]The rating system used by the school district has only three classifications: "Excellent," "Standard," and "Unsatisfactory." A "Standard" rating means the teacher is performing satisfactorily.

you made decisions about one of your assistants which were not within your role. When you were asked for follow up information on this situation, you did not follow up."

In response, Warning wrote on the evaluation form:

"I have requested from administrator and support staff for help in all matters but still this whole situation seems to be blamed on me."

Attached to the 2002-03 evaluation was a memorandum, also dated January 31, 2003, and written by Principal Call. It stated, in part:

"This afternoon we met to hold the post-conference meeting for your final evaluation. At this meeting the discussion centered on the concerns I have regarding your relationship and interactions with your support staff. I reviewed with you these areas and talked about how you need to be more effective in managing your classroom team. It is your responsibility to model and demonstrate for your assistants how they should be responding to support staff.

You received your copy of the evaluation on the morning of January 30, 2003. That morning, after receiving the evaluation, you approached the Speech Pathologist (in front of other staff) and blamed her for your unsatisfactory ratings. Your actions caused this person to be found in tears in the hall by several other staff members. You also addressed another one of your support staff members that same morning in such a negative manner that she told you that she was not going to be able to assist you on a field trip.

Your reaction to the evaluation and interactions with the staff following demonstrated unsatisfactory behavior. At this post conference I discussed with you the need for you to develop a plan of what you will do to address the concerns that have arisen related to teaming in your classroom. You told me that you didn't know what to do and wanted me to help you with this. I again explained that I wanted you to come up with a plan and then we can discuss it. You asked me what happens if you do not come up with a plan, will I fire you. I told you that I had not said anything about firing you."

Warning submitted a written response to the memorandum, stating:

"The areas I was evaluated in unsatisfactorily seem unfair. I was unaware of the support staff avoiding my classroom and not feeling comfortable until the administrator made me aware of the personalty conflict with an assistant in my classroom. (I was disappointed that the chain of communication was not followed. The support staff should have communicated their concerns to me first.) I was then directed to communicate this to my assistant and try to make the classroom atmosphere more comfortable for the support staff. I was directed to start documenting concerns. I had no concern in regards to my assistants other than in the beginning of the year. Since then everything has been excellent and I saw no need for further action.

    \*\*\*

I feel my attempts to communicate and be a team member are belittled and or not considered. I feel the support staff does not respond to my attempts to communicate and then it seems as if I am rated poorly for the personality communication problems."

Warning was given another memo from Principal Call several months later, on May 12, 2003. This memo provided Warning, once again, with written notice of concerns the administration had regarding Warnings dealings with her support staff. The document also served to memorialize a conference meeting that had been held earlier that day and was attended by Warning, Principal Call, an Occupational Therapist (OT) named Robin, and two other members of Warning's support staff. The purpose of the meeting was to discuss Warning's interference in Robin's decisionmaking regarding scheduling of "make-up" therapy time with a student. Warning was advised that she did not have the authority or responsibility to assess another professional staff member's performance. Warning was advised that she was the only teacher who had any problems dealing with Robin and, in the future, if she had any concerns regarding a staff member's performance, she should direct her concerns to the administration rather than the staff member. Also, Warning was advised that she had acted improperly by discussing her staff concerns with a parent.

The memo also reprimanded Warning for her behavior during the meeting. According to the memo, Warning and one of her assistants

were rolling their eyes and nudging each other on the leg when certain comments were made by Robin or the principal. The memo advised Warning that she was expected to act more responsibly and professionally, and reminded her that she would be unable to meet the needs of her students if "the environment [in her classroom] is so tense that the support staff does not want to work in your room."

In closing, Principal Call noted that, since the team meeting conducted earlier in the year, there had been "little or no improvement" in the situation in Warning's classroom and that Warnings interactions with her support staff was having a negative impact on her performance as a professional. Principal Call asked Warning to develop a plan on how she could improve the situation in her classroom. Principal Call commented that this was the second request for such a plan and she stated, "In developing this plan, you want to take time and look at what you need to do, not what others need to do." Warning was also advised that her classroom behavior would continue to be monitored for the remainder of that school year and the next.

Warning responded to this memo largely by denying that her behavior with regard to Robin had been improper. Warning also denied rolling her eyes or nudging her assistant. In addition, Warning expressed her belief that, since the earlier team meeting, "everything had improved tremendously." Warning made no response to Principal Call's request that she develop a plan to improve the atmosphere in her classroom. Instead, she provided a list of "concerns" she had regarding Robin, mentioning three or four instances when, in Warning's view, Robin had not acted as a team player in her classroom.

In another memo dated May 20, 2003, Principal Call documented the fact that Warning failed to show up for a scheduled meeting to discuss the plan she had been directed to develop on improving staff relationships in her classroom. The memo indicated that Principal Call contacted Warning to remind her of the meeting and when Warning finally arrived at Principal Call's office, she had not prepared a written plan. Moreover, Principal Call noted that when she asked Warning if she had any ideas on how she could improve her classroom atmosphere, Warning "with a smile on her face" responded, "I am going to continue to do an excellent job as I have done in the past."

Principal Call also noted that Warning had acted unprofessionally

after receiving the earlier memo and she advised Warning that she should take seriously the concerns that were being addressed with her, particularly in light of the fact that one of Warnings's assistants had filed a complaint with the State Board alleging that students in her classroom were not getting all the services they required. As a result of that complaint, Principal Call needed Warning to supply copies of her lesson plans for that school year in addition to supplying a plan on how she could improve her interactions with staff members.

Warning's response to Principal Call's May 20, 2003, memo, dated May 22, 2003, purports to be Warning's plan for improving her relationships with her staff. The document indicates that it is the third plan submitted by Warning due to the fact that others had been "rejected." This plan, however, did not contain any ideas on how Warning might improve her relationships with her staff. Instead, it simply listed things Warning agreed to do or "continue" to do. For example, the first item provides:

> "1. Will continue to communicate with all SPEED Team members by: (a) By [*sic*] a plan developed and agreed upon by all members of the SPEED Team."

The last two items on the list provide:

> "6. Per your request (Kathy Call), Teacher will <u>not</u> monitor support staff minutes.
>
> 7. Per your request (Kathy Call), I will decrease my jovial demeanor and be more serious." (Emphasis in original.)

The next item in Warning's personnel file is her evaluation for the 2003-04 school year, Warning's third probationary year.[2] The evaluation form, dated January 26, 2004, was completed by Principal Call and, once again, gave Warning an overall rating of "Standard." In her comments, Principal Call commended Warning for making "great

---

[2]Section 34–84 of the School Code (105 ILCS 5/34–84 (West 2004)), provides that permanent appointment of a full-time teacher "shall be made for merit only" and, after January 1, 1998, only after "satisfactory service for a probationary period of *** 4 years." The Code provision also states that teachers, once permanent, shall be subject to removal for cause, but that "during [this probationary] period the board may dismiss or discharge any such probationary employee upon the recommendation, accompanied by the written reasons therefor, of the general superintendent of schools."

strides" in implementing suggestions that had been made and for taking "a great step in the direction of creating a positive environment" in her classroom. The evaluation indicates that Warning was given all new assistants for this school year and "on several occasions" Warning had sought help directly from Principal Call to work out a plan that would allow these new assistants to be more actively involved in the lesson plans. Principal Call encouraged Warning to continue the practice of seeking help in areas of need.

Principal Call also advised Warning in the evaluation that she needed to be more consistent in her data collection in order to provide a better measure of her students' progress. She noted, too, that Warning needed to implement different activities to keep her students engaged when they were not working directly with a staff member.

The following 2004-05 school year was Warning's fourth year as a probationary teacher for SPEED District 802. On November 16, 2004, Assistant Principal Julie Egan conducted an initial observation of Warning's classroom for that school year. Egan described Warning's classroom as "warm and supportive" and gave Warning high grades for her "positive and caring connections" with the students, her motivation of the students, and her management and organization of the classroom in regard to providing space and interesting activities for the students. However, Egan suggested that Warning "continue to have open communication" with her team and "consider meeting daily" with them so they could discuss the monthly units and the needs of each student. Also, similar to comments in Warning's evaluation a year earlier, Egan reminded Warning that she must prepare written daily lesson plans and that she needed to find a means of monitoring and recording student progress.

The next entry in Warning's personnel file is a memo from Dr. Geneva Clasberry, director of Human Resources, dated December 8, 2004. The subject line reads: "Attempt to Correct Deficiencies" and the body of the memo explains that on December 3, 2004, a paraprofessional had reported Warning for using inappropriate language. The memo memorializes a meeting that was held with Warning, which was also attended by the new principal, Ben Runyan, and a union representative, Beth Wierzbicki. The memo indicates that Warning admitted at the meeting that she had used improper language, but commented that she had only been "joking."

It was noted in Dr. Clasberry's memo that the current incident was the second time during that school year[3] that a paraprofessional had reported Warning for inappropriate language. Warning was advised that her conduct was unacceptable and that her language had to be corrected. Warning also was advised that further incidents could result in discipline "up to dismissal." To remedy the problem, Warning was told that she would be required to participate in training focused on building interpersonal skills.

In Warning's response, dated December 15, 2004, she implied that her use of improper language was not serious because she had been talking to an adult outside the classroom setting. Further, Warning wrote:

> "This behavior was corrected immediately and My [*sic*] apology was accepted. According to the hierarchy in the chain of command, the situation was taken care of between the individuals. And was also at the time stated by the paraprofessional that it was not a situation that needed to be addressed. This should have gone no further (which was two weeks later) and blown out of proportion. The situation had been resolved.
>
> I am a respectable and professional individual.
>
> I will continue to refrain from using inappropriate language and I will participate in training sessions."

In addition to the above-quoted response, Warning submitted a memo in which she describes various behaviors of the paraprofessional who had reported her inappropriate language. It appears Warning believed that the paraprofessional reported her in retaliation for incidents that had occurred in the classroom between October and November of 2004.

In February 2005, Warning had her second classroom observation for that school year. This observation was conducted by Principal Runyan. Following the observation, Principal Runyan completed Warning's evaluation, gave a copy to Warning, and scheduled a meeting for March 1, 2005, to review and discuss the evaluation with her. The evaluation that was given to Warning rated her

---

[3]There is no evidence in the personnel file regarding the previous incident of improper language referred to here.

"Unsatisfactory" in four of seven categories, giving her an overall rating of "Unsatisfactory." In the commentary at the end of the evaluation, Principal Runyan wrote:

> "Rachel, during the school day the students in your classroom need to be actively engaged in more instructional activities. From my observations there appears to be a lot of unengaged and misuse of instructional time. You've had several encounters over the last couple of years in reference to inappropriate communication with team members. Recommendations have been made from previous counseling sessions with Dr. Clasberry and me to address the inappropriate comment issues. As a supervisor of paraprofessionals it is your responsibility to maintain poise, tact and professionalism in both oral and written communication. Due to the overall summative rating of unsatisfactory, it is my recommendation to Dr. Pointer, Executive Director of SPEED, that you be placed on a plan to correct deficiencies[4] to work on the four unsatisfactory domains in this evaluation. Please find attached a corrective deficiency plan. Immediately upon receipt and review of the plan, corrective actions must take place by May 1, 2005, or recommendation for your termination will be presented to Dr. Pointer."

At the scheduled March 1, 2005, meeting, Principal Runyan planned to review the evaluation with Warning and discuss with her the "Corrective Action Plan" that he developed. The plan identified two main areas of concern regarding Warning's performance: her communication with classroom support staff and her "instructional presentation." The plan indicated that Warning's classroom presentation lacked "consistency, student engagement, and fails to meet the standards and expectations of best practice approaches within the identified group of students." The plan indicated that Runyan and Warning would meet biweekly for remediation and, initially, required

---

[4]The collective-bargaining agreement between the union and the District prohibits the District from dismissing a third- or fourth-year probationary teacher for performance reasons "without at least one documented attempt to correct deficiencies."

Warning to complete two tasks: (1) utilize a resource guide and certain identified strategies (previously presented to her by Principal Runyan) to develop and put into practice a plan to improve communication with staff; provide evidence that team meetings are being conducted and of any other methods used to accomplish the goal; (2) produce evidence of weekly lesson plans and themes, documenting the amount of time each student is engaged in "standard-based instruction."

For the March 1, 2005, evaluation conference, Warning brought with her a union representative, Beth Wierzbicki. Rather than discuss the evaluation, Warning and Beth took this opportunity to argue with Runyan about the evaluation form, itself. They insisted that Runyan was required to rate each of the subcategories contained within the main evaluation domains. Runyan, however, asserted that the collective-bargaining agreement did not require him to rate the individual subcategories and that he would not do so since the evaluation clearly indicated the areas of concern regarding Warning's deficiencies.

At the close of this meeting, Principal Runyan told Beth that her services would no longer be necessary at subsequent remediation meetings. Warning objected and Beth asserted the position that Warning was entitled to union representation because Warning's job was on the line. Principal Runyan, however, expressed his belief that representation was neither necessary nor required at performance based meetings.

The next scheduled meeting between Warning and Principal Runyan was set for March 4, 2005. Beth accompanied Warning and, according to notes Beth took, they again spent much of the time during this second meeting requesting additional clarification as to the specific performance objectives in which Warning was rated unsatisfactorily. Beth's notes indicated that she and Warning debated with Runyan on the requirements of the Illinois Learning Standards. Also, Warning tried to demonstrate to Principal Runyan how her lesson plans were based on the Learning Standards, as well as her students' IEPs (Individual Education Plans). Beth noted that, at one point during the meeting, Principal Runyan received a phone call. Beth then directed Warning to retrieve her lesson plans and the Illinois Assessment Book from her classroom. Upon her return, Beth and Warning debated further with Principal Runyan over the application

of the learning standards. Warning also tried to compare herself to other teachers, asserting that she had spoken to other teachers at the school and, in her opinion, they were not using the learning standards she was now being required to implement. When this happened, Principal Runyan complained that the remediation process was becoming much too cumbersome and that Beth should not be present at future meetings. Runyan believed that with Beth present the focus remained on the evaluation procedure and general standards, preventing them from working on Warning's personal corrective action plan. Principal Runyan told Warning that he just wanted her to complete the corrective action tasks that he had assigned her.

Sometime after the March 4, 2005, meeting, Principal Runyan ran into Warning in the hall. He asked to meet with her briefly and Warning agreed and they went to Runyan's office. There, Principal Runyan tried to explain to Warning why he was not going to allow Beth to be a part of the remediation meetings anymore. Warning, however, said she would refuse to meet without representation and began to read from her union card. Principal Runyan became upset, jumped up from his chair and, in a loud voice, said, "I don't care what the card says." Warning responded that she did not have to take this treatment and walked out of the meeting.

On March 9, 2005, Principal Runyan visited Beth's classroom and asked to speak with her. He told Beth that he did not hold anything against her personally, nor was he against the union, but that he had discussed the situation with Dr. Pointer, executive director of SPEED, and they had agreed that union representation was not appropriate at Warning's remediation meetings. Beth disagreed and asserted the position that, because Warning might be subject to dismissal, she had a right to union representation. Beth admitted that Principal Runyan acted professionally when speaking with her. He also conceded that, as a new principal, he was somewhat unfamiliar with the rules concerning the right to union representation. Nevertheless, he maintained that union representation in this situation was neither appropriate nor necessary.

After this meeting, Beth wrote a memo to Principal Runyan, dated March 17, 2005, asserting the position that Warning was entitled, by the collective-bargaining agreement and her *Weingarten* rights, to have representation of her choice, if she requests it. The next day, March 18,

2005, Beth accompanied Warning to her next scheduled remediation meeting. When they arrived at Principal Runyan's office they saw that Dr. Pointer was present. Dr. Pointer was quite upset and began the meeting by advising Beth that she would no longer be permitted to attend Warning's remediation meetings. According to notes Beth took of the meeting, Warning became emotional and expressed her belief that "things were very negative against her" and that she felt she needed the support of Beth's representation because she really felt like she was going to be terminated, and she still did not understand why because her performance had not been substandard prior to that.

As the meeting progressed, Dr. Pointer countermanded herself and agreed to permit Beth to attend Warning's remediation meetings. However, this permission was contingent on Beth's promise to act as a mere observer during the meetings. In other words, Beth was not permitted to speak or participate in the meetings, communicate with Warning during the meeting, or answer any questions directed at Warning. In fact, Beth was told that if she tried to participate in the meeting in any way, Principal Runyan was instructed to have her removed from the meeting.

On March 22, 2005, Principal Runyan held another remediation meeting to make up for the March 18 meeting that had been taken up discussing Beth's participation. Beth attended this meeting and, according to her notes, Principal Runyan used this time to review Warning's lesson plans with her. Runyan also discussed with Warning the methods she used in her classroom, as well as her communication with staff and assignment of duties to peer professionals. According to Beth, Principal Runyan appeared to be satisfied with Warning's lesson plans and the information she provided to him. He then gave Warning a reading assignment–to read a chapter from a book that Principal Runyan had shown Warning. When Principal Runyan indicated that he would need the book back, Warning immediately became upset and demanded to know how she was going to read a 53-page chapter without access to the book. Beth noted that she interceded, suggesting that Warning photocopy the chapter.

Beth also reported that during the March 22, 2005, meeting, Principal Runyan broached the subject of Warning's past difficulties in "getting along with people." Immediately, Warning became defensive and wanted to know specifics, stating that she was "not

familiar with what he was talking about." When Principal Runyan mentioned a particular situation involving a parent, Warning denied there had been a problem, explaining that the parent did not speak English and, for that reason, she told the parent to speak with the social worker, who spoke Spanish.

Because of notice requirements under the collective-bargaining agreement, Warning was given a "non-renewal letter" dated March 24, 2005, informing her that her teaching contract would not be renewed for the following year due to performance reasons. However, Warning was also advised by Dr. Pointer that her contract might still be renewed if she successfully completed the corrective action plan.

On March 31, 2005, Principal Runyan sent a memo to Warning indicating, once again, that Beth would not be permitted to attend her corrective action plan meetings. In a letter to IEA UniServ Director Janet Zitzer, dated April 6, 2005, Dr. Pointer explained the reason for Principal Runyan's renewed decision to exclude Beth–although Beth had previously agreed to act as a mere observer at the remediation meetings, Beth had, once again, begun to "insert" herself into the discussions "in a different way." Specifically, because Beth had agreed not to *speak* at the meetings, she began passing notes back and forth with Warning. Also, using her body language–such as nodding and shaking her head–she made her feelings known to Warning. Dr. Pointer wrote in the letter that she considered Beth's behavior to be "insubordinate," "manipulative," and "unacceptable."

After meeting with Warning and Beth one final time on April 21, 2005, Principal Runyan prepared a written evaluation dated April 22, 2005, informing Warning that he was recommending that the District not renew her contract. He noted that, although she had made "demonstrated improvement" in the area of instruction, there had been little growth in the area of communication. Principal Runyan wrote:

> "During the time span you were working on the plan to correct deficiencies, more concerns were raised due to your lack of ability to communicate. You made the choice to be late for several scheduled meetings and failed to participate in a process that enabled you and me to communicate freely. Your actions have created barriers in our ability to effectively communicate. The process was tension driven and failed to honestly develop to a relationship to move forward in this

area.

　　"During the planning time I had to present requests to you in verbal and written format. You failed to consistently provide prepared evidence when requested and seemed inadequately prepared for our meetings. We were unable to get into open dialog during our meeting time. During the conversations you failed to see your role in the breakdown of communications. The corrective process became cumbersome and chaotic due to the choices you made."

Having determined that Warning's overall performance remained unsatisfactory, Warning was advised on April 28, 2005, that her teaching contract would terminate at the end of that school year.

In August 2005, Warning and the SPEED Education Association, IEA-NEA (the Association), filed an unfair labor practice charge with the IELRB against SPEED District 802. The complaint alleged that the District dismissed Warning "in retaliation for Warning's insistence on having a fellow employee and Union representative assist her in defending herself against the possibility of adverse employment actions." In a subsequent "Position Statement," the plaintiffs elaborated, stating: (1) Warning had insisted upon having union representation at all of her meetings with the administration of SPEED District 802 from December 2004 through the spring of 2005 and this was a protected activity because she had the right to union representation at these meeting pursuant to both the Illinois Educational Labor Relations Act and the collective-bargaining agreement, (2) that the District was aware that Warning was asserting a right to union representation at the meetings she had with the administration, and (3) that the District was hostile toward Warning because she exercised her rights and, ultimately, took adverse action against her, *i.e.*, did not renew her contract, because she exercised her right to have union representation accompany her to her remediation meetings with the District.

The parties presented witness testimony and other evidence at a hearing held before an Administrative Law Judge (ALJ) on November 28, 2006. In April 2007, the ALJ issued a recommended order, finding that the District had violated section 14(a)(3) and, derivatively, section 14(a)(1), of the Act (115 ILCS 5/14(a)(1), (a)(3) (West 2004)). As a result, the ALJ recommended that Warning be reinstated to her

teaching position and awarded back pay. Also, because the dismissal had come after Warning's fourth probationary year, the ALJ recommended that she be granted tenure.

The IELRB adopted the findings and recommendations of the ALJ. Two members of the Board, however, did not agree that awarding Warning tenure was a proper remedy.

The District then appealed the decision of the IELRB to the appellate court. In a divided opinion, the appellate court affirmed. 392 Ill. App. 3d 628. Justice Garcia dissented. He believed that Warning had no right to union representation at her postevaluation meetings and, thus, he did not believe the evidence supported a finding that the District discriminated against Warning as a result of union activity. But, even if the evidence did support a finding that the District had violated the Act, Justice Garcia believed that granting tenure was an inappropriate remedy.

The District filed a timely petition for leave to appeal with this court pursuant to Supreme Court Rule 315(b), and we granted the petition. In addition, the Illinois Association of School Boards and the Illinois Association of School Administrators were permitted to file an *amicus* brief in support of SPEED District 802, and the Illinois Federation of Teachers was permitted to file an *amicus* brief in support of Warning and the Association.

ANALYSIS
Standard of Review

What we must decide in this case is whether the IELRB correctly determined that SPEED District 802 violated section 14(a)(3) and, derivatively, section 14(a)(1), of the Illinois Educational Labor Relations Act (the Act), when it did not renew the teaching contract of Warning, a nontenured, probationary teacher. The standards by which we review the findings and decision of the IELRB are not in dispute. The parties agree that judicial review of an IELRB decision is governed by the Administrative Review Law (735 ILCS 5/3–101 *et seq*. (West 1994)) and extends to all issues of law and fact presented by the record. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). On issues of law, we review the Board's findings *de novo*; while findings on issues of fact are deemed *prima facie* correct unless they are against the manifest weight of the

evidence. *City of Belvidere*, 181 Ill. 2d at 204-05. Further, as we stated in *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97-98 (2007):

> "[T]he clearly erroneous standard of review is proper when reviewing a decision of the IELRB or the ILRB because the decision represents a mixed question of fact and law. [Citation.] An agency decision will be reversed because it is clearly erroneous only if the reviewing court, based on the entirety of the record, is " 'left with the definite and firm conviction that a mistake has been committed.' " [Citation.] While this standard is highly deferential, it does not relegate judicial review to mere blind deference of an agency's order."

### Sections 14(a)(1) and 14(a)(3) of the Act

In the case at bar, the Board decided that the District violated section 14(a)(3) and, derivatively, section14(a)(1), of the Act (115 ILCS 5/14(a)(1), (a)(3) (West 2004)). Section 14, entitled "Unfair Labor Practices," provides in pertinent part:

> "(a) Educational employers, their agents or representatives are prohibited from:
>> (1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.
>> ***
>> (3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization." 115 ILCS 5/14(a)(1), (a)(3) (West 2004).

It has been held that section 14(a)(1) refers to adverse action taken against an employee as a result of any protected concerted activity, while section 14(a)(3) refers specifically to discrimination based on union activity. See *Bloom Township High School District 206 v. Illinois Educational Labor Relations Board*, 312 Ill. App. 3d 943, 957 (2000). Where, as here, an alleged violation of sections 14(a)(1) and 14(a)(3) stems from the same conduct, the section 14(a)(1) violation is said to be derivative of the section 14(a)(3) violation. *Bloom Township*, 312 Ill. App. 3d at 957. In such cases, the test to be applied is the one used to determine whether a section 14(a)(3) violation occurred. *Bloom Township*, 312 Ill. App. 3d at 957. A *prima facie* case

-16-

of a section 14(a)(3) violation requires proof that the employee was engaged in activity protected by section 14(a)(3); that the District was aware of that activity; and that the employee was discharged for engaging in that protected (union) activity. *Board of Education, City of Peoria School District No. 150 v. Illinois Educational Labor Relations Board*, 318 Ill. App. 3d 144, 150 (2000). The third part of the test is established if the employee's protected activity was a substantial or motivating factor for the discharge or other adverse action taken against the employee. *Hardin County Education Ass'n v. Illinois Educational Labor Relations Board,* 174 Ill. App. 3d 168, 174 (1988). Since motive is a question of fact, a Board's finding as to motive can only be set aside if it is against the manifest weight of the evidence. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989); *Bloom Township*, 312 Ill. App. 3d at 957. However, even if a *prima facie* showing has been made, there can be no finding that an unfair labor practice occurred if the employer can demonstrate, by a preponderance of the evidence, that the adverse action would have occurred notwithstanding the protected activity. *City of Burbank*, 128 Ill. 2d at 346; *Board of Education, City of Peoria School District No. 150*, 318 Ill. App. 3d at 150.

In the case at bar, the District challenges the Board's decision that it committed an unfair labor practice on two grounds. First, the District contends that the first prong of the test used to prove a section 14(a)(3) violation was not satisfied. The District argues that Warning was not engaged in a protected union activity when she insisted on having representation at her remediation meetings. Second, the District contends that, even if a *prima facie* case was made, the manifest weight of the evidence supports a finding that Warning's contract would not have been renewed in any event, due to deficiencies in her teaching and communication skills. Accordingly, the District asks us to find that the Board's decision, finding that the District committed an unfair labor practice, is clearly erroneous.

Protected Activity

We first consider the District's contention that the Board erred when it found that Warning made out a *prima facie* case of a section 14(a)(3) unfair labor practice. As noted above, for the Board to have found that Warning demonstrated a *prima facie* case of a section

14(a)(3) violation, and derivatively a section 14(a)(1), violation, the Board had to find that Warning satisfied her initial burden of proving that she had been discriminated against (*i.e.*, discharged) because she had engaged in an activity protected by section 14(a)(3) (*i.e.*, union activity).

Warning and the Association alleged in the complaint against the District that Warning was engaged in a protected activity when she insisted on union representation at her remediation meetings. Warning and the Association contended that Warning was entitled to union representation by both the Labor Act and the collective-bargaining agreement between the Association and SPEED District 802. Before the ALJ, they pointed to section 3–10 of the collective-bargaining agreement, which provides:

> "A bargaining unit member shall be entitled to have present a representative of the Association during any meeting which leads to disciplinary action."

They argued that, because Warning's remediation meetings with Runyan had the potential of resulting in adverse action, *i.e.,* Warning's dismissal, she had the right to representation under the agreement.

The District challenged this allegation, noting that section 3–10 of the collective-bargaining agreement further provides that "disciplinary action is not performance based." Thus, the District maintained that, because remediation meetings are performance based, the collective-bargaining agreement did not afford Warning a right to union representation and, therefore, there was no evidence that Warning suffered any adverse action as a result of her participation in a protected union activity.

In resolving this controversy, the ALJ agreed that section 3–10 of the collective-bargaining agreement defined "disciplinary action" as "not performance based." Nevertheless, the ALJ dismissed the District's argument in one sentence, stating: "There is no evidence, however, that the contractual provision was intended to waive a non-tenured teacher's *Weingarten* rights to union representation during an investigatory conference."

In *National Labor Relations Board v. Weingarten*, 420 U.S. 251, 43 L. Ed. 2d 171, 95 S. Ct. 959 (1975), it was held that an employer violated section 8(a)(1) of the NLRA–the model for our section 14(a)(1)–when it denied an employee's request for union

-18-

representation at an "investigatory interview" which the employee reasonably believed would result in discipline. The ALJ found that remediation meetings are "investigatory," relying on *Summit Hill School District 161*, 4 Pub. Employee Rep. (Ill.) par. 1009, No. 86–CA–0090–C (IELRB December 1, 1987).

It is true that, in *Summit Hill*, the IELRB found that remediation meetings were "investigatory." However, that is only one of the IELRB's findings in that case, which the ALJ selectively adopted. *Summit Hill* involved a tenured teacher who was denied union representation at postobservation (remediation) meetings held during the one-year remediation period required for tenured teachers by the School Code. When asked to determine whether this denial of representation was an unfair labor practice, the IELRB in *Summit Hill* held:

"Under the Education Reform Act, the remediation process may lead to one of two results: successful remediation or discharge. One purpose of the process is to alert the teacher to perceived problems and provide the teacher with a one-year opportunity to improve. *** However, discipline may be imposed at the end of the one-year remediation period if the teacher has not received a 'satisfactory' or better rating. Ill. Rev. Stat. Ch. 122, pars. 24A–5(i) and (j). In other words, attempted remediation is a required preliminary step for the alternative result under the Education Reform Act, dismissal. If improvement is not shown, the employee may expect the commencement of the dismissal process, during which the observations of a teacher undergoing remediation and the reports of such observations may very well be used as 'evidence' to support the district's case for dismissal. Thus, a teacher may reasonably fear that that [*sic*] at least some, if not all, post-observation conferences may ultimately lead to discharge.

*Nevertheless, we conclude that the right to have union representation as a matter of law does not attach to post-observation conferences ***.*" (Emphasis added.) 4 Pub. Employee Rep. (Ill.) par. 1009, at IX–32.

The IELRB then explained that educational labor laws in Illinois do not provide for union representation in remediation. One reason is

that postobservation conferences are required by the State Board of Education and, therefore, "an employer is not free, as in the private sector or the usual investigatory interview, to discontinue a postobservation conference and proceed to obtain information from other sources." Furthermore, "discontinuance would also undermine one of the goals of the conference which is to discuss and correct deficiencies." Accordingly, the IELRB concluded in *Summit Hill* that, since the law did not afford a tenured teacher the right to union representation at postobservation conferences, if such a right was to exist, it would have to be contained in the collective-bargaining agreement, but was not.

In the present case, the ALJ found that the Board's holding in *Summit Hill* did not extend to nontenured teachers. Its rationale for this determination was that Warning's remediation period was much shorter, lasting only from March 1 to May 1, 2005, and that "the union representative whom Warning repeatedly requested *** was her representative to protect her interests against unjust dismissal and, similarly, the interests of all non-tenured teachers under remediation." The ALJ then recommended that the Board rule that the District violated section 14(a)(3) of the Act.

The Board subsequently adopted the ALJ's recommendation. In its written order, the Board, addressing the contested issue of whether Warning had engaged in protected activity, stated:

"Here, Warning engaged in union activity when she invoked representation by Association grievance representative Beth Wierzbicki. In *Chicago Board of Education*, 22 PERI 143, Case No. 2004–CA–0061–C (IELRB, April 11, 2006), the Illinois Educational Labor Relations Board ('IELRB') ruled that an employee engaged in union activity when he sought the union's assistance in disciplinary matters and when union representatives accompanied him to pre-disciplinary meetings."

However, in the cases cited by the Board, the employees who were found to have engaged in union activity had a right to union representation. The Board never addressed the District's claim that Warning was not engaged in protected activity because she was not entitled to union representation at her remediation meetings. Instead, the Board stated: "It is unnecessary for us to decide whether denying Warning union representation at the post-evaluation meetings would

-20-

have been an unfair labor practice under *Summit Hill School District 161*, 4 PERI 1009, Case No. 86–CA–0090–C (IELRB, December 1, 1987) and *NLRB v. Weingarten*, 420 U.S. 251 (1975)." The Board reasoned that this was so because "in this case it is not alleged that the District violated the Act by denying Warning union representation."

The District timely appealed the Board's ruling to the appellate court, again arguing that, to prove an unfair labor practice under section 14(a)(3), it was imperative that Warning show that she had engaged in a protected activity. The District further argued that the Board was clearly erroneous in finding that Warning engaged in a protected activity because Warning did not have the right to union representation at her postobservation remediation meetings. The appellate court disagreed with the District, stating:

> "We agree with the holding in *Summit Hill School District 161*, 4 Pub. Employee Rep. (Ill.) par. 1009 n.7, No. 86–CA–0090–C, at IX–33 (IELRB December 1, 1987) (hereinafter 4 Pub. Employee Rep. (Ill.) par. 1009), where the Board determined that since postobservation remedial meetings can sometimes result in a teacher's discharge, the suggestion that such meetings were not 'investigatory' must be rejected. We agree with the Board that Warning was engaged in a protected activity when she requested union representation during her remedial meetings with Runyan. See, *e.g.*, *Georgetown-Ridge Farm Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 239 Ill. App. 3d 428, 464, 606 N.E.2d 667 (1992) (employee engaged in protected activity by seeking the assistance of union representative concerning reduction of hours and filing of complaint); *Abuzir*, 22 Pub. Employee Rep. (Ill.) par. 143, at 553 (employee engaged in protected activity when union representative accompanied him to predisciplinary meetings)." 392 Ill. App. 3d at 636-37.

This is the sum total of the discussion on the District's main claim on appeal. Justice Garcia dissented, however, stating, "Warning's desire to have union representation at her postevaluation meetings [could not be transformed] into union activity when no such right exists under the collective bargaining agreement between SPEED District 802 and SPEED Education Association." 392 Ill. App. 3d at 642 (Garcia, J., dissenting). Justice Garcia also believed that the Board

had improperly side-stepped this issue, stating:

> "Either Ms. Warning had the right to have union representation at the postevaluation meetings or she did not. If she did not, Speed District 802 was well within its 'supervisory authority' to restrict union representation at the postevaluation meetings to a nonactive role." 392 Ill. App. 3d at 641 (Garcia, J., dissenting).

Now, before this court, the District asks us to find that the Board and the appellate court improperly determined that Warning engaged in a protected activity when she insisted on having union representation at her remediation meetings. The District maintains–as it has from the beginning–that Warning had no right to union representation at her postobservation conference and remediation meetings with Principal Runyan. Accordingly, the District contends that the Board's decision that it committed an unfair labor practice when it dismissed Warning is clearly erroneous. We agree.

Warning, the Association and the Board continue to maintain that Warning engaged in protected union activity when she asked for and received union representation at her evaluation conference and postobservation remediation meetings. They contend, "there is no issue here of whether Warning had a right to union representation during the meetings; the Board did not make, nor did it have to make, that determination." In their view, "the District's right-based argument comes too late because the District failed to enforce its view that Warning did not have a right to representation." Based on this rationale, they claim the District's rights-based assertion is "irrelevant." They contend "the issue here is not whether Warning had the right to Union representation, because it was never denied her, or whether that right was waived by contract, but rather, once she engaged Union representation during the meetings, the District retaliated against her and discharged her for doing so."

We reject the argument that if the District did not believe that Warning was entitled to union representation at her remediation meetings, it should have refused to meet with her under those conditions and then sought a ruling on whether their action was an unfair labor practice. As explained in *Summit Hill*, imposing such a requirement is impractical, if not impossible. The District, unlike other employers, does not have the discretion to discontinue remediation and attempt to obtain information from other sources. Warning was a

-22-

fourth-year probationary teacher and under section 3–9 of the collective-bargaining agreement she could not be dismissed for performance reasons without the District establishing at least one documented attempt to correct deficiencies. Thus, the District was not free to discontinue remediation.

Further, it is counterintuitive–particularly with regard to nontenured teachers where the remediation period is brief–to require the District to discontinue corrective meetings and seek a ruling on whether a teacher has the right to union representation. As stated in *Summit Hill*, such a requirement would undermine the goal of remediation conferences, which is to correct deficiencies.

We believe the District acted reasonably in this situation. It permitted Warning to have a union representative accompany her to her remediation meetings despite its belief that she was not entitled to that right.[5] Also, we agree with Justice Garcia that Warning's insistence on having union representation at her remediation meetings did not automatically transform this situation into a protected union activity. An employee engages in protected union activity only when the employee's actions invoke a right under the law or the collective-bargaining agreement. As Warning and the Association concede in their brief, the United States Supreme Court concluded in *National Labor Relations Board v. City Disposal Systems, Inc.*, 465 U.S. 822, 79 L. Ed. 2d 839, 104 S. Ct. 1505 (1984), that "employees engage in protected activity when invoking contractual rights because that activity is a direct extension of collective bargaining."

In the case at bar, Warning's proof that she engaged in a protected union activity is lacking because she has provided no evidence that she was entitled, either by law or contract, to union representation at remediation meetings. As stated in *Summit Hill*, even though remediation meetings are "investigatory," the right to union representation does not attach by law and, to exist, must be contracted for through collective bargaining. The collective-bargaining agreement

---

[5]It should be noted here that two other teachers were placed on corrective action plans at the same time as Warning. Both of these teachers were permitted to have union representation at their remediation meetings. One teacher voluntarily left her position without completing the corrective action plan. The other teacher successfully completed his corrective action plan and had his teaching contract renewed.

-23-

here does not explicitly give employees the right to union representation at remediation meetings. Rather, our reading of the contract indicates to us that the right to union representation does not attach to postobservation conferences and remediation, where the possible "disciplinary action" the employee faces is performance based. We reach this conclusion based on section 3–8(F) of the collective-bargaining agreement, which specifically provides, "Evaluative conclusions and remediation decisions are made in the sole discretion of the evaluating supervisor and are non-grievable and non-arbitrable." This being so, a union representative would have no official role to play at postobservation conferences and remediation meetings.

We conclude, therefore, that Warning failed to prove that she was entitled to union representation. And if Warning did not have a right to union representation, then Warning and the Association failed to prove that Warning was engaged in union activity when she insisted on having union representation at her evaluation conference and remediation meetings and when she chose to follow her representative's lead in taking an assertive and confrontational stance with regard to her evaluation and the administration's attempts to provide corrective instruction.

Without a showing of protected activity, there can be no finding that the District discriminated against Warning for engaging in protected activity. We find, therefore, that Warning and the Association failed to prove the District violated section 14(a)(3) of the Act. As a result, we find the Board's decision, that the District committed an unfair labor practice when it failed to renew Warning's teaching contract, is clearly erroneous.

In light of our conclusion that the District's actions did not constitute an unfair labor practice, we need not consider whether reinstating Warning to a tenured position was an appropriate remedy.

CONCLUSION

For all the reasons stated above, we reverse the judgment of the appellate court and set aside the decision of the IELRB that SPEED District 802 committed an unfair labor practice when it failed to renew Rachel Warning's teaching contract. The cause is remanded to the Board for further proceedings consistent with this opinion.

Appellate court judgment reversed;
Illinois Educational Labor Relations Board decision set aside;
cause remanded.


CHIEF JUSTICE KILBRIDE, dissenting:

I agree with the dissent's analysis with two exceptions. First, on the unfair labor practice discussion, I believe the dissent's application of *Weingarten* and *Summit Hill* is unnecessary given the facts of this case. As noted by the Illinois Educational Labor Relations Board, Warning was not denied union representation. Instead, she alleged that the District retaliated against her for having union representation at the meetings during the 2004-05 school year. Thus, it is unnecessary to decide whether denying Warning union representation at those meetings would have been an unfair labor practice under *Weingarten* and *Summit Hill*.

Warning engaged in protected union activity by having union representation at the meetings, as permitted by the collective-bargaining agreement. I agree with the dissent that Warning was entitled to union representation at those meetings and her teaching contract was not renewed based on her exercise of that right. The Board correctly determined that the District committed an unfair labor practice by not renewing Warning's teaching contract for engaging in protected union activity. Accordingly, I join in the dissent's conclusion that the Board did not err in finding the District committed an unfair labor practice.

Second, I disagree with the dissent's analysis of the remedy for the unfair labor practice. Under the Illinois Educational Labor Relations Act, the Board is not only empowered to order a party committing an unfair labor practice to stop the unfair practice, but may also "take *additional affirmative action*." (Emphasis added.) 115 ILCS 5/15 (West 2004). The Board's purpose in fashioning a remedy in an unfair labor practice case is to "make-whole" the parties by placing them " 'in the same position they would have been in had the unfair labor practice not been committed.' [Citation.]" *Paxton-Buckley-Loda Education Ass'n v. Illinois Educational Labor Relations Board*, 304 Ill. App. 3d 343, 353 (1999). The Board has " 'substantial flexibility and wide discretion to ensure that victims of unfair labor practices be returned to the position that would have obtained had the illegal

conduct not occurred.' [Citation.]" *Paxton-Buckley-Loda Education Ass'n*, 304 Ill. App. 3d at 353-54. The Board's remedial orders are reviewed for abuse of discretion. *Paxton-Buckley-Loda Education Ass'n*, 304 Ill. App. 3d at 353.

Here, the Board adopted the administrative law judge's recommendation reinstating Warning to her teaching position and awarding back pay. The Board determined that reinstatement of Warning's teaching position was the appropriate remedy for the nonrenewal of her teaching contract because it placed her in the position that would have existed had the unlawful nonrenewal not occurred. The Board certainly had the authority to reinstate Warning's employment following the nonrenewal of her teaching contract. In fact, reinstatement of employment was the only remedy that could "make-whole" Warning for the unlawful nonrenewal. The Board did not abuse its discretion in ordering this remedy.

The reinstatement of Warning's employment would have resulted in tenure by operation of the School Code because she was dismissed at the end of her fourth and final probationary year. If her employment were reinstated, Warning would have completed her probationary period and entered into contractual continued service under section 24–11 of the School Code (105 ILCS 5/24–11 (West 2004)).

Contrary to the dissent, the Board had the authority to order the reinstatement of Warning's teaching contract with the consequence that she receive tenure. Section 14(a)(3) of the Act prohibits discrimination "in regard to hire or *tenure of employment* or any term or condition of employment to encourage or discourage membership in any employee organization." (Emphasis added.) 115 ILCS 5/14(a)(3) (West 2004). By not renewing Warning's teaching contract at the end of her final probationary year based on her protected union activity, the District discriminated "in regard to *** tenure of employment." The denial of tenure was a direct result of the nonrenewal of Warning's teaching contract.

Under section 14(a)(3), denial of tenure based on the exercise of protected union rights is unlawful. The Board's authority must include the power to remedy the unlawful deprivation of tenure based on protected union activity. The Board, therefore, had the authority under the Act to order the "make-whole" remedy of reinstating Warning's teaching contract with the consequence that she receive tenure.

Further, Warning's acquisition of tenure as a result of the

reinstatement of her employment would not interfere with the District's legitimate interest in overseeing tenure decisions. The record indicates that prior to the protected union activity in this case, Warning's performance had always been rated at least "standard" or satisfactory. Warning received "standard" or satisfactory ratings in each of her first three years of employment with the District. She received a rating of "professional," "excellent," and "outstanding" in the fall of her fourth and final probationary year. It was only after Warning was subsequently admonished about using inappropriate language with a paraprofessional and sought the assistance of a union representative that questions were raised about her performance. The meetings following that admonition when Warning requested union representation led to the nonrenewal of her teaching contract.

As the dissent clearly establishes, Warning was entitled to union representation at those meetings and the record shows her teaching contract was not renewed based on her exercise of that protected right. The record indicates that Warning's teaching contract would have been renewed and she would have acquired tenure if she had not been discharged based on an unfair labor practice.

I recognize that the District has a legitimate interest in overseeing tenure to assure continuous service by teachers of ability and experience. See *Johnson v. Board of Education of Decatur School District No. 61*, 85 Ill. 2d 338, 344 (1981). The District's tenure decisions must be based on lawful considerations, however. The nonrenewal of Warning's teaching contract was based on her protected union activity, and the District does not have a legitimate interest in denying a probationary teacher tenure based on an unfair labor practice. Thus, the fact that Warning would have acquired tenure through the Board's reinstatement of her employment does not interfere with the District's legitimate interest in overseeing tenure decisions.

Based on these circumstances, I conclude that the Board did not abuse its discretion in reinstating Warning's employment. The reinstatement of employment would have resulted in tenure. There is no need for an additional probationary year because the District never identified any legitimate concern with Warning's performance. In my view, the appellate court properly confirmed the Board's decision and I would affirm the appellate court's judgment. Accordingly, I respectfully dissent.

-27-

JUSTICE FREEMAN, dissenting:

I believe that Warning was entitled to union representation at the meetings during the 2004-05 school year. Therefore, I would affirm in part the judgment of the appellate court (392 Ill. App. 3d 628), which confirmed the decision of the Illinois Educational Labor Relations Board (Board). I would uphold the Board's determination that SPEED District 802 (District) committed an unfair labor practice when it dismissed Warning. However, I disagree with the Board that tenure is the proper remedy. Rather, I would restore Warning to a final probationary year. Accordingly, I respectfully dissent.

## I. BACKGROUND

The District is a special education joint agreement district comprised of 15 member school districts that pool their resources to provide special education services to students of all age and grade levels who have a range of disabilities. The District employed Warning as a teacher. As mandated by section 24–11 of the School Code, Warning had a probationary period of four consecutive years. However, after the four-year probationary period, Warning would have entered "contractual continued service," *i.e.*, tenure. See 105 ILCS 5/24–11 (West 2004).[6]

## A. Employment Documents

A collective-bargaining agreement exists between the District and the SPEED Education Association/IEA-NEA (Association or Union). The District's evaluation and remediation procedures are set forth in the parties' collective-bargaining agreement, supplemented by the District's employee handbook. This case turns on the correct interpretation and application of the agreement. Because the majority opinion omits a comprehensive recitation of the evaluation and

---

[6]This court cites section 34–84 of the School Code (105 ILCS 5/34–84 (West 2004)) for this four-year probationary period. Slip op. at 6 n.2. This section provides specifically for appointments and promotions of teachers in cities having a population exceeding 500,000 persons. However, section 24–11 expressly states: "The employment of any teacher in a program of a special education joint agreement *** shall be under this and succeeding Sections of this Article." 105 ILCS 5/24–11 (West 2004).

remediation procedures in the collective-bargaining agreement, I discuss the relevant provisions in detail.

Section 3–8 of the agreement, captioned "Employee Evaluation," begins by declaring that "all evaluations shall be conducted in good faith *** and in accordance with the provisions of this Agreement. The criteria and procedures contained herein shall be applied uniformly through [the District]." Subsection A provides that teachers shall be formally evaluated at least once during each nontenured year. Subsection B provides: "Prior to October 1, employees will be informed as to who will be responsible for each employee's supervision and evaluation. At this time, the evaluation procedure and instrument to be used for the school year will be reviewed and each employee shall receive a complete copy of the evaluation instrument." Subsection B further provides that the evaluation of all teachers shall be completed by March 1.

Section 3–8C details the evaluation process. A qualified administrator must evaluate each teacher through personal observation. Each District supervisor must hold a pre-evaluation conference with each teacher to discuss expectations, and to set the specific dates and times for observations. Each evaluation must be conducted with not less than two on-the-job site observations for no less than 30 consecutive minutes for each observation. The second observation must be separated from the first by at least one work day. After the first observation, the teacher and the evaluator must discuss strengths and weaknesses. They will determine the need for additional activities, observations, and technical assistance, and decide a schedule for these activities. The completed formal evaluation must be reduced to writing and submitted to the teacher no later than March 1.

The teacher must receive a written evaluation within five school days of the final observation. Between 24 hours and five school days after receipt of the written evaluation, a postevaluation conference must take place at a mutually agreeable date and time. An evaluation should include specific reasons for the ratings given. Any teacher who receives any unsatisfactory rating, but is not placed on a remediation plan, must be provided specific suggestions for improvement, developed by the evaluator and the employee.

Significantly, section 3–8F provides: "*Evaluative procedures, contained herein, are subject to the grievance procedure*. Evaluative conclusions and remediation decisions are made in the sole discretion

-29-

of the evaluating supervisor and are non-grievable and non-arbitrable." (Emphasis added.) Section 7H of the employee handbook, labeled "Staff Evaluation Procedures," supplements the collective-bargaining agreement as follows: "Evaluative procedures, contained herein, *including those pertaining to employee remediation*, are subject to the grievance procedure." (Emphasis added.)

Section 3–9 of the collective-bargaining agreement is labeled "Remediation of Staff." Subsection B provides that nontenured teachers in the third or fourth probationary year will not be dismissed for performance reasons without at least one documented attempt to correct deficiencies. Subsection D provides: "Remediation of staff for performance based reasons shall not be subject to grievance and/or arbitration."

Section 3–10 of the collective-bargaining agreement is labeled "Employee Discipline." Subsection A provides: "A bargaining unit member shall be entitled to have present a representative of the Association during any meeting which leads to disciplinary action. *** A bargaining unit member may choose which union representative is present provided it does not unreasonably delay the meeting. Disciplinary action is not performance based." Subsection B provides a nonexclusive and nonhierarchical list of disciplinary consequences that include: "written warning; copy placed in employee's personnel file, with duration of time to remain in file stated in letter" and "dismissal." Subsections C and D provide: when the District determines to hold a disciplinary meeting, the employee shall be informed of the violation that is to be discussed; disciplinary decisions resulting from the meeting shall be reduced to writing and presented to the employee; and no bargaining unit member shall be dismissed or suspended without pay for disciplinary reasons without at least one documented attempt by a supervisor with a 12-month period to correct the behavior.

In sum, the District must conduct all teacher evaluations according to the collective-bargaining agreement, supplemented by the employee handbook. Evaluation conclusions and remediation decisions are nongrievable. However, evaluative procedures, including those pertaining to employee remediation, are grievable. Further, section 7–1A of the collective-bargaining agreement defines a "grievance" as a complaint by a teacher or the Union that there has been a "violation, misinterpretation, or misapplication" of the

collective-bargaining agreement. Also, a teacher is entitled to union representation for disciplinary matters. These provisions memorialize the relationship between the District and the Union as it pertains to teacher evaluation and remediation. Thus, whether a nontenured teacher is entitled to union representation at an employment meeting with the District depends on how the meeting is characterized and the nature of the teacher's grievance.

### B. Warning's Meetings With District Personnel

Beginning in the 2001-02 school year, Warning was employed by the District as a full-time teacher of high-school-age students with severe physical disabilities in its Program for Adaptive Learning (PAL). During each of her first three probationary years, Warning received from PAL Principal Kathy Call an overall summative evaluation rating of "standard," *i.e.*, satisfactory. During the 2002-03 school year, Warning's second probationary year, Principal Call expressed concerns regarding Warning's performance. However, Warning ultimately received an evaluation rating of "standard" for the 2002-03 school year, and her employment contract was renewed. For the 2003-04 school year, Principal Call gave Warning an overall rating of "standard."

The 2004-05 school year was Warning's fourth and final probationary year. Principal Call was replaced by the new PAL principal, Benoit Runyan. In the fall of 2004, Warning was notified, pursuant to section 3–8B of the collective-bargaining agreement, that Assistant Principal Julie Egan would evaluate her during that school year. After observing Warning's classroom in November 2004, Egan rated Warning as "professional," "excellent," and "outstanding."

On December 8, 2004, District Human Resources Director Dr. Genevra Clasberry sent a memorandum to Warning, which stated in full:

> "On Friday, December 3, 2004, a substitute paraprofessional reported to me that you had used inappropriate language with her prior to the Holiday break. I discussed the incident with you while the substitute was present and you stated that you did use the language but it was in the context of 'joking.' After further investigation, a paraprofessional present during the incident confirmed that inappropriate language was used. She stated that she did not feel that the language was directed

towards anyone or meant to be derogatory. However, as Mr. Runyan and I discussed with you in the presence of Beth Wierzbicki (Union representative), inappropriate language should not be used in the classroom setting regardless of the context. Furthermore, this is the second incident during your employment with [the District] in which a substitute paraprofessional expressed concerns about the use of inappropriate language. As Mr. Runyan and I discussed with you, this behavior is unacceptable and must be corrected immediately. Your interaction with all staff must be professional and appropriate for the school setting. The following are expectations of you in the future:

- You will refrain from using inappropriate language in the classroom. Another report could *result in disciplinary action up to dismissal*.
- You will be responsible for selecting and participating in training focusing on building your skills in interacting with adults in the school setting. You must receive approval from Mr. Runyan prior to participating.
- You will meet with Mr. Runyan and I prior to the end of the school year to discuss your progress.

*This memo will remain in your personnel file for the duration of your employment with [the District].*" (Emphases added.)

The record further indicates that Warning requested union representation at this disciplinary meeting, and that Wierzbicki spoke on Warning's behalf. Additionally, in a written response, Warning admitted, explained, and apologized for the inappropriate language. She concluded: "I will continue to refrain from using inappropriate language and I will participate in training sessions."

On February 15, 2005, Warning had her second classroom observation for the 2004-05 school year pursuant to section 3–8 of the collective-bargaining agreement. Approximately one week prior to the observation, Warning was notified that Principal Runyan, rather than Assistant Principal Egan, would conduct the observation. Principal Runyan did not hold a preobservation conference with Warning in contravention of section 3–8C of the collective-bargaining agreement. Warning testified that Runyan's observation lasted only approximately

20 minutes, also in violation of section 3–8C.

According to paragraph 15 of the parties' "Joint Statement of Uncontested Facts," on March 1, 2005:

> "Warning had a meeting with Principal Runyan to discuss Runyan's recent observation of Warning's class. Warning requested Union representation at this meeting and was accompanied by Wierzbicki. At this meeting, Runyan provided Warning with a summative evaluation in which he gave Warning unsatisfactory rating[s] in instructional planning and development, management of instructional time, instructional presentation and feedback, [and] communication and professional responsibilities. Runyan stated in his evaluation of Warning that due to the overall summative rating of unsatisfactory, it was his recommendation that Warning be placed on a plan to correct her deficiencies. Runyan attached a corrective deficiency plan to his evaluation and stated that *** Warning must take corrective actions by May 1, 2005, or Runyan would recommend her termination. At the meeting, Warning asked that Mr. Runyan separately rate each objective cited in her evaluation. Runyan denied Warning's request, stating that he would not separately rate each objective, that he was not required to do so and that he had never done so in the past. Wierzbicki responded that Runyan had rated each of the objectives in her [Wierzbicki's] evaluation separately. Wierzbicki was evaluated using a different instrument than Warning. At the conclusion of the meeting, Runyan stated that Wierzbicki would not be needed at any further meetings. Warning responded that she wanted Union representation. Runyan stated that 'having the Union involved just makes the situation more complicated, I would rather just go through giving you instructions.' "

Warning and Wierzbicki each testified at the administrative hearing. According to their testimony, Principal Runyan's evaluative procedures did not conform to the format prescribed by the employee handbook. Warning brought the handbook to the meeting, where she and Wierzbicki pointed to the prescribed evaluation format that Runyan should have used. As the meeting progressed, Runyan's demeanor was described as growing increasingly "nervous," "agitated," "impatient," and "angry."

-33-

Also on March 1, 2005, Principal Runyan sent a letter to Dr. Betty Pointer, the District executive director, informing her that he presented a corrective deficiency plan to Warning at the meeting with Wierzbicki. In this letter, elsewhere in the record designated a "Corrective Action Plan," Principal Runyan identified two areas of concern: (1) Warning's "communication with classroom support personnel," and (2) her "instructional presentation." The plan described the first issue as follows:

> "During the school year we had one identified incident that was discuss[ed] with Dr. [Clasberry] (Director of Human Resource[s]) and myself. During our meeting it was brought to my attention that this was the second incident within one calendar year related to inappropriate comments directed towards a paraprofessional supporting you in the classroom. I shared with you during the year that some support staff members have felt intimidated in your classroom setting. As a classroom instructor you have the responsibility of setting the tone and climate in modeling appropriate communications/actions with all students and staff members within classroom and building setting [*sic*]."

This paragraph plainly references the events memorialized in Dr. Clasberry's December 8, 2004, disciplinary memorandum to Warning.

Wierzbicki accompanied Warning to subsequent meetings, where they debated the evaluative procedures with Principal Runyan and other District personnel, who consistently stated that they did not want Wierzbicki to participate at these meetings. Slip op. at 10-12. On March 24, 2005, the District's governing board gave Warning notice of dismissal and nonrenewal of her teaching contract at the end of the 2004-05 school year. On the same day, Dr. Pointer notified Warning that the "notice of dismissal and non-renewal is contingent on the successful completion of the Corrective Action Plan." On April 28, 2005, Dr. Pointer notified Warning that her teaching contract with the District would terminate at the end of the 2004-05 school year. The letter cites "the unsuccessful attempt to correct deficiencies that were outlined in [Principal Runyan's March 1, 2005, corrective deficiency plan]." See slip op. at 10-14. Additional pertinent background will be discussed in the context of my analysis of the issues.

II. ANALYSIS

In the present case, the initial question presented is whether the District committed an unfair labor practice in violation of section 14(a)(3) and, derivatively, section 14(a)(1) of the Illinois Educational Labor Relations Act (IELRA or Act) (115 ILCS 5/14(a)(1), (a)(3) (West 2004)). If so, the next question is whether the grant of tenure to Warning was the appropriate remedy.

A. Unfair Labor Practice

The primary issue in this case is simple: Was Warning engaged in a protected union activity when she insisted on having Wierzbicki attend the meetings at issue during the 2004-05 school year? The court holds that she was not. I disagree with this conclusion because the collective-bargaining agreement allowed for such representation. Having concluded that Warning was legally entitled to have Wierzbicki present at the meetings, I have no trouble accepting the Board's finding that the District terminated Warning because she had engaged in protected union activity.

To properly analyze this issue, the first step is to identify the situations in which the parties' collective-bargaining agreement confers the right to representation. When an employer and a labor union bargain about a subject and memorialize that bargain in a collective-bargaining agreement, they create a set of rules governing their future relations. *National Labor Relations Board v. United States Postal Service*, 8 F.3d 832, 836 (D.C. Cir. 1993). Rights to union representation must be based upon, and may be limited by, the collective-bargaining agreement. See *Ryan v. Union Pacific R.R. Co.*, 286 F.3d 456, 459 (7th Cir. 2002). Further, courts read collective-bargaining agreements as a whole. *International Brotherhood of Electrical Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 406 (7th Cir. 2002).

The IELRA reflects the intent of the General Assembly to protect the rights given in collective-bargaining agreements between teachers and educational employers. Section 14(a) of the IELRA prohibits educational employers from, in pertinent part: "(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act[;] *** (3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization" (115 ILCS 5/14(a)(1), (a)(3) (West 2004)). In light of the close parallel

-35-

between section 14(a) of the IELRA and section 8(a) of the National Labor Relations Act (NLRA) (29 U.S.C. §158(a) (2000)), federal interpretations of the NLRA are persuasive authority in construing the IELRA. See *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 579 (2005); *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989); *Wapella Education Ass'n v. Illinois Educational Labor Relations Board*, 177 Ill. App. 3d 153, 161 (1988).

Section 14(a)(1) refers to adverse action taken against an employee as a result of any protected concerted activity, while section 14(a)(3) refers specifically to discrimination based on union activity. Where, as here, an alleged violation of sections 14(a)(1) and 14(a)(3) stems from the same conduct, the section 14(a)(1) violation is said to be derivative of the section 14(a)(3) violation. In such cases, the test to be applied is the one used to determine whether a section 14(a)(3) violation occurred. *Bloom Township High School District 206 v. Illinois Educational Labor Relations Board*, 312 Ill. App. 3d 943, 957 (2000) (and cases cited therein).

A section 14(a)(3) violation requires proof of improper motivation on the part of the employer. Under this test, the complainant must establish a *prima facie* case by proving that: (1) the employee was engaged in activity protected by section 14(a)(3) of the Act; (2) the employer was aware of that activity; and (3) the employee was discharged for engaging in that activity. *Bloom Township*, 312 Ill. App. 3d at 957; *Georgetown-Ridge Farm Community Unit School District No. 4 v. Illinois Educational Labor Relations Board*, 239 Ill. App. 3d 428, 464 (1992). Because the test of discrimination under section 14(a)(3) turns on motive and because motive is a question of fact (*City of Burbank*, 128 Ill. 2d at 345), this court is limited to ascertaining whether the Board's findings are against the manifest weight of the evidence. "An administrative agency's factual determinations are contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). The District contends that Warning failed to establish the first and third

elements of her *prima facie* case.[7]

## 1. *Protected Union Activity*

The Board found that Warning engaged in protected union activity. I agree. An employee engages in activity protected by section 14(a)(3) when the employee seeks union assistance. *Georgetown-Ridge*, 239 Ill. App. 3d at 464; *Abuzir*, 22 PERI ¶143 (IELRB 2006) ("Abuzir engaged in union activity when he sought the Union's assistance in disciplinary matters [and] when union representatives accompanied him to pre-disciplinary meetings"). The District cannot contest that Warning had union representation at multiple meetings with Principal Runyan and other District administrators during the 2004-05 school year.

Rejecting the Board's finding, this court reasons that Warning's union representation, in the person of Wierzbicki, at the 2004-05 meetings did not constitute protected union activity because Warning did not have a right to union representation at those meetings. I disagree. Whether Warning was entitled to union representation at the meetings with the District depended on how the meetings were characterized and the nature of Warning's grievance. Therefore, the characterization of a particular meeting has legal consequences, and must be thoughtfully considered. However, the parties, the appellate court dissent, and my colleagues in the majority loosely characterize the meetings during the 2004-05 school year variously as "remediation meetings" (see slip op. at 10-13, 23), "postevaluation meetings" (see slip op. at 15), "evaluation conference" (see slip op. at 10, 22, 24), "postobservation remediation meetings" (see slip op. at 22), and a meeting that involved potential "discipline" (see slip op. at 8). These labels eventually coagulate and muddle this court's analysis. The fact that the meetings defy precise characterization reveals that they

---

[7]The District concedes that Warning established the second element of her *prima facie* case. The District indisputably knew of Warning's union activity. On multiple occasions during the 2004-05 school year, Principal Runyan met personally with Warning and her union representative, Wierzbicki. Also, Runyan continually referred to Warning "having the Union involved," and directed Warning not to bring union representation with her to their meetings.

covered a wide variety of grounds, some grievable, such as evaluative procedure, and some nongrievable, such as remediation decisions. Moreover, the meetings covered discipline as well.

During the 2004-05 school year, Warning's fourth and final probationary year, her first confrontation with the District is memorialized in the December 8, 2004, memorandum from Dr. Clasberry, the District's human resources director. Union representative Wierzbicki accompanied Warning at the meeting. The memorandum expressly referred to "disciplinary action up to dismissal," and directed Warning to meet with Dr. Clasberry and Principal Runyan prior to the end of the school year to discuss the matter. Further, the memorandum stated that it would remain in her personnel file for the duration of her employment with the District. This matter was indisputably treated as employee discipline pursuant to section 3–10 of the collective-bargaining agreement.

Pursuant to section 3–8B of the collective-bargaining agreement, Assistant Principal Egan was designated to evaluate Warning during that school year. However, contrary to that section, Warning was notified that Principal Runyan would conduct her second classroom evaluation.

Section 3–8F of the collective-bargaining agreement, as supplemented by section 7H of the employee handbook, provided that evaluation conclusions and remediation decisions were nongrievable, but evaluation procedures, including those pertaining to employee remediation, were subject to the grievance procedure. At the postobservation conference, Warning requested union representation and, assisted by Wierzbicki, questioned Runyan as to the appropriate evaluative procedure. Warning and Wierzbicki voiced their concern that, as provided by the collective-bargaining agreement, there had been "a violation, misinterpretation, or misapplication" of its provisions. Additionally, Runyan attached to Warning's evaluation a "corrective deficiency plan," which identified as an area of concern the *disciplinary* matter of December 2004.

The record clearly shows that the collective-bargaining agreement granted Warning the right to union representation for at least two reasons. First, Warning had the right to union assistance pertaining to the separate and distinct December 2004 disciplinary incident. Indeed, the District plainly intertwined the disciplinary matter with her performance evaluations, which raised a procedural discrepancy

justifying Warning to seek union assistance. This disciplinary matter, which ostensibly was closed in December 2004, became part and parcel of the "remediation." Second, Warning certainly had the right under the collective-bargaining agreement to reasonably question the other disparities or inconsistencies in the evaluative procedure imposed on her. Since evaluative procedure is a matter that is grievable under the collective-bargaining agreement, it is not surprising that union representation would be wanted to investigate whether in fact the evaluative procedures contained in the agreement were properly followed.

Therefore, it appears that Warning's "remediation" meetings included a component that was clearly "investigatory." In *National Labor Relations Board v. J. Weingarten, Inc.*, 420 U.S. 251 (1975), the United States Supreme Court accepted the decision of the NLRB that section 7 of the NLRA (29 U.S.C. §157 (2000)) creates a statutory right in an employee to refuse to submit without union representation to an interview which the employee reasonably fears may result in his or her discipline. *Weingarten*, 420 U.S. at 256. The Court further recognized the Board's contours and limits on what are now commonly called *Weingarten* rights: (1) the right inheres in the guarantee of section 7 to act in concert for mutual aid and protection; (2) the right arises only in situations where the employee requests representation; (3) the employee must reasonably believe the investigation will result in disciplinary action; (4) exercise of the right may not interfere with legitimate employer prerogatives. In other words, the employer is free to continue the investigation without interviewing the employee, and thereby leave to the employee the choice between having an interview unaccompanied by the representative, or having no interview and forgoing any benefits that might be derived therefrom; (5) the employer has no duty to bargain with any union representative who may be permitted to attend the investigatory interview. *Id.* at 256-60.

The Court held that the action of the employee in seeking to have the assistance of his or her union representative at a confrontation with the employer clearly falls within the plain language of section 7 that employees shall have the right to engage in concerted activities for the purpose of mutual aid or protection. *Id.* at 260; see 29 U.S.C. §157 (2000). The Court reasoned that this applies even though the employee alone may have an immediate stake in the outcome; after all, the

employee seeks "aid or protection" against a perceived threat to his or her employment security. The union representative whose participation the employee seeks is, however, safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing punishment unjustly. The representative's presence is an assurance to other employees in the bargaining unit that they, too, can obtain aid and protection if called upon to attend a like interview. *Id*. at 260-61.

In the present case, Warning was entitled to union representation at the December 2004 investigatory meeting. Further, Principal Runyan expressly incorporated this investigatory matter as a component of Warning's remediation. Therefore, insofar as Warning's remediation pertained to this disciplinary matter, she had the right to union representation.

Further, in *Summit Hill Council, AFT, Local 604*, 4 PERI ¶1009 (IELRB 1987), the Board found *Weingarten* rights to inhere in the IELRA. The Board observed that section 3(a) of the IELRA is virtually identical to section 7 of the NLRA. Compare 115 ILCS 5/3(a) (West 2004) with 29 U.S.C. §157 (2000). The Board then stated: "We conclude that Section 3(a) of the IELRA encompasses the right to refuse to submit to an investigatory interview without union representation where the employee reasonably fears that the interview might result in discipline." The Board explained that a teacher under remediation "may reasonably fear that at least some, if not all, post-observation conferences may ultimately lead to discharge." "Because of the give and take that may occur at a post-observation conference," the Board determined that postobservation conferences are "investigatory" interviews.[8]

However, the question presented in *Summit Hill* was whether a *tenured* teacher under remediation is entitled to union representation at a postobservation conference upon request. The Board in *Summit Hill* concluded that *Weingarten* rights do not attach to the postobservation conferences of tenured teachers under remediation,

[8]Therefore, this court's characterization of Warning as "taking an assertive and confrontational stance with regard to her evaluation" (slip op. at 24) is not only erroneously pejorative, but also contrary to this express Board recognition.

based on the provisions of the Education Reform Act of 1985, which added article 24A to the School Code. Pub. Act 84–126 (eff. Aug. 1, 1985); Pub. Act 84–972 (eff. Sept. 25, 1985) (adding 105 ILCS 5/art. 24A). The Board observed that section 24A sets forth the minimum role of the union in the evaluation process, subject to supplementation of that role through collective bargaining. The Board in *Summit Hill* further observed that the collective-bargaining agreement in that case did not provide for union representation at postevaluation conferences. Consequently, the Board in *Summit Hill* found that the school district did not violate the IELRA by refusing the teacher's request for union representation during a postobservation conference.

In the present case, while the Board found it unnecessary to apply *Weingarten* and *Summit Hill* in this case,[9] I agree with the ALJ that the *Summit Hill* limitation of *Weingarten* rights does not apply to nontenured teachers. As the ALJ correctly noted, the remediation process for a nontenured teacher is notably different from the process that article 24 of the School Code prescribes for tenured teachers. For example, where a tenured-teacher evaluation results in an unsatisfactory rating, participants in the remediation plan include not only the teacher and administrator, but also a "consulting teacher," who must be a bargaining unit employee. The union is permitted to supply a roster of teachers qualified to serve as consulting teachers, and a school district must select a consulting teacher from that list. The consulting teacher helps to develop the remediation plan, and then advises the tenured teacher in remediation on how to improve his or her teaching skills. See 23 Ill. Adm. Code 25.875. No similar provisions exist in the School Code and supporting regulations for nontenured teachers. In the absence of such provisions, the remediation process for a nontenured teacher is governed by the collective-bargaining agreement.

In this case, the collective-bargaining agreement did not clearly and unmistakably waive the right to union representation at a postobservation conference. To the contrary, section 3–8F of the agreement, supplemented by section 7H of the employee handbook, expressly provides that evaluative procedures, *including those*

---

[9]The Board reasoned: "In this case it is not alleged that the District violated the [IELRA] by denying Warning union representation, but rather that it retaliated against her for having union representation."

*pertaining to employee remediation*, are subject to the grievance procedure. The meetings between Warning and the District involved disciplinary matters as well as evaluative and remediation procedure, all of which entitled Warning to union representation under the collective-bargaining agreement. Additionally, the "remediation" meetings here clearly had a component that was "disciplinary," which unquestionably entitled Warning to union representation. If this were not enough, the pervasive intermingling of references to "remediation" and "discipline" throughout the 2004-05 school year was reasonably confusing to such a degree as to allow Warning, assisted by Wierzbicki, to question in good faith the evaluative process, as granted by the collective-bargaining agreement.

Accordingly, because Warning was nontenured, her right to union representation at the 2004-05 meetings depended on whether the collective-bargaining agreement granted her that right. The record clearly shows that it did. I conclude that Warning had the right to union representation. Because Warning *did* seek union assistance during the 2004-05 meetings with the District, I would hold that Warning engaged in protected union activity, satisfying the first element of her *prima facie* case.

### 2. *Antiunion Motivation*

This court ends its analysis by concluding that Warning failed to establish the first element of her *prima facie* case. Because I conclude that Warning *did* establish this element, I now analyze the remaining elements of her complaint.

The third element of a *prima facie* case for a violation of section 14(a)(3) of the IELRA requires the employee to prove that he or she was discharged for engaging in the protected union activity. *Bloom Township*, 312 Ill. App. 3d at 957. The complainant must establish that " 'the employee's protected conduct was a substantial or motivating factor in the adverse action.' " *City of Burbank*, 128 Ill. 2d at 345 (quoting *National Labor Relations Board v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983)). Surveying federal labor law decisions, this court explained:

> "Antiunion motivation may reasonably be inferred from a variety of factors, such as an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities [citation], proximity in time

between the employees' union activities and their discharge [citation], disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action [citations], inconsistencies between the proffered reason for discharge and other actions of the employer [citation], and shifting explanations for the discharge [citations]." *City of Burbank*, 128 Ill. 2d at 346.

Since motive is a question of fact, the Board may infer discriminatory motive from either direct or circumstantial evidence. *Id.* at 345.

In the present case, Warning's protected union activity was seeking union assistance in her meetings with the District during the 2004-05 school year. The Board found that Warning has established the element of antiunion motivation for two reasons: expressed hostility and shifting explanations for the nonrenewal of Warning's contract. Neither of these findings is clearly erroneous.

First, the Board found that "Runyan and Dr. Pointer repeatedly expressed hostility toward Warning's union activity in the form of representation by Wierzbicki." Indeed, Principal Runyan's animus against this protected union activity cannot seriously be disputed. The record is replete with Runyan's oral and written statements to Warning that he did not want union representative Wierzbicki to assist Warning at the meetings.

Second, the Board found evidence of shifting explanations for the District's actions in Runyan's April 22, 2005, evaluation, his final written evaluation in which he recommended nonrenewal of Warning's contract. I quote the evaluation in relevant part:

"You received an unsatisfactory rating in two main areas: Instructional Presentation and Professional Communication/Responsibilities. *** There has been some demonstrated improvement in the area of instruction. You have taken steps to align your instruction to state standards in design and implementation.

[While] you were working on the plan to correct deficiencies more concerns were raised due to your lack of ability to communicate. You made the choice to be late for several scheduled meetings and failed to participate in a process that enabled you and me to communicate freely. *Your actions have created barriers in our ability to effectively communicate.* The process was tension driven and failed to

honestly develop to a relationship to move forward in this area.

*** You failed to consistently provide prepared evidence when requested and seemed inadequately prepared for our meetings. We were unable to get into open dialog during our meeting time. During the conversations you failed to see your role in the breakdown of communications. *The corrective process became cumbersome and chaotic due to the choices you made.*

By the time this process was over there appeared to be little growth in the area of improved communication. Therefore it is my assessment that you have not met the terms of the plan to correct deficiencies. It will be my recommendation to [the District] that you be terminated." (Emphases added.)

The Board observed that, according to the evaluation, Warning failed to remediate concerning "professional communication," yet the same document states that Warning had "demonstrated improvement in the area of instruction," yet the District contended before the Board that Warning was discharged because of "inadequate teaching abilities." The Board, as the finder of fact, could infer a discriminatory motive from these shifting explanations. Additionally, the Board found that the "actions" and "choices" to which Runyan refers were Warning's repeated assertions of her right to union representation, as granted by the collective-bargaining agreement. The Board found that these remarks were additional evidence of the District's expressed hostility toward Warning's protected union activity. The manifest weight of the evidence supports the Board's finding of antiunion motivation and, consequently, its finding that Warning has proved a *prima facie* case of discriminatory discharge in violation of 14(a)(3) of the IELRA.

### 3. *District's Affirmative Defense*

Once a complainant establishes a *prima facie* case:

"the employer can avoid a finding that it violated the statute by demonstrating that the discharged employee would have been fired for a legitimate business reason notwithstanding the employer's antiunion animus. [Citations.] Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, for it must be

determined whether the reasons advanced are *bona fide* or pretextual. If the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry. [Citation.] However, where the employer advances legitimate reasons for the discharge and is found to have relied upon them in part, then the case is characterized as one of 'dual motive' and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement." *City of Burbank*, 128 Ill. 2d at 346-47. Accord *Bloom Township*, 312 Ill. App. 3d at 960; *Georgetown-Ridge*, 239 Ill. App. 3d at 464. This burden shifting has been characterized as an affirmative defense for the employer. See *Transportation Management Corp.*, 462 U.S. at 400.

The Board concluded that this was a "pretext case." The Board noted the District's asserted reasons for nonrenewing Warning's contract–her alleged failure to remediate concerning professional communications and her allegedly inadequate teaching abilities. The Board found that Runyan's April 22, 2005, evaluation of Warning evinced the pretextual nature of the District's asserted reasons. The evaluation indicated that the District was not discharging Warning based on her allegedly inadequate teaching abilities, because Runyan stated in the evaluation that Warning had shown "demonstrated improvement" in the area of instruction. The Board observed that the evaluation also contained "veiled references" to Warning's insistence that she be represented by Wierzbicki. Moreover, according to the Board, "Runyan inaccurately stated in the memorandum that Warning was late for several scheduled meetings and failed to provide 'prepared evidence when requested.' The inaccuracy of these statements demonstrates their pretextual nature."

The Board also observed that, during the 2004-05 school year, another employee was under a corrective action plan with Runyan and was represented by a union representative other than Wierzbicki.[10] This employee was not dismissed. The Board found that the District objected particularly to "Wierzbicki's assertiveness in representing

---

[10]The fact that other employees had union representation during meetings with District personnel underscores my belief that the collective-bargaining agreement entitled Warning to such assistance.

Warning."

Whether an employer's articulated reason for its employment decision is pretextual is a question of fact for the Board to decide, and its decision will not be disturbed on review unless it is against the manifest weight of the evidence. See *City of Burbank*, 128 Ill. 2d at 350; *Bloom Township*, 312 Ill. App. 3d at 957; *Georgetown-Ridge*, 239 Ill. App. 3d at 465. Further, the ALJ heard the testimony of several witnesses, including Warning, Wierzbicki, and Dr. Pointer. It was the Board's function, as the finder of fact, to determine the weight to be given the evidence and to assess the credibility of the witnesses. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006); *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 513 (1985); *Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board*, 208 Ill. App. 3d 220, 230 (1991). Here, the evidence supports the Board's finding that the District's stated reasons for nonrenewing Warning's contract were pretextual and that the nonrenewal was actually the product of unlawful discrimination. I would hold that the Board's finding of pretext was not against the manifest weight of the evidence.

In sum, the collective-bargaining agreement granted Warning the right to union representation at her meetings with the District during the 2004-05 school year. Further, the record clearly shows that Warning was discharged for engaging in this protected union activity. In nonrenewing Warning's contract, Dr. Pointer expressly stated that Warning failed to correct the two deficiencies that Principal Runyan proffered in his March 1, 2005, corrective deficiency plan. The first deficiency that Runyan alleged was "professional communication," which pertained to the December 2004 disciplinary matter, which clearly allows for union representation. The second alleged deficiency was Warning's "instructional presentation," which, as the Board observed, Runyan concluded that Warning had "demonstrated improvement." Warning had the right, with the assistance of Wierzbicki, to question in good faith whether the format of Warning's evaluation constituted a "violation, misinterpretation, or misapplication" of the collective-bargaining agreement. The manifest weight of the evidence supports the Board's findings that Warning established a *prima facie* case of a violation of section 14(a)(3) of the IELRA, and that the District's proffered reasons for nonrenewing Warning's contract were pretextual. Consequently, I would uphold the

Board's determination that the District committed an unfair labor practice as not clearly erroneous.

## B. Remedy

Because this court holds that the District's conduct did not constitute an unfair labor practice, my colleagues in the majority do not address whether granting Warning tenure was an appropriate remedy. Although the District committed an unfair labor practice when it dismissed Warning, I conclude that tenure is not the appropriate remedy. Rather, I would restore Warning to a final probationary year.

After finding that the District violated section 14(a)(3) and, derivatively, section 14(a)(1) of the IELRA, the ALJ recommended that Warning be reinstated to her teaching position and awarded back pay. Further, because Warning was dismissed at the end of her fourth and final probationary year, the ALJ recommended that Warning be granted tenure. The Board adopted this recommended remedy. However, dissenting in part, two members of the Board concluded that an award of tenure is beyond the authority of the Board. The appellate court confirmed the decision of the Board, including the remedy of tenure. 392 Ill. App. 3d at 639-40.

Pursuant to section 15 of the IELRA, if the Board finds that a party has committed an unfair labor practice, the Board is "empowered to issue an order requiring the party charged to stop the unfair practice, and may take *additional affirmative action*." (Emphasis added.) 115 ILCS 5/15 (West 2004). As earlier observed, the IELRA closely parallels the NLRA, including section 15 of the IELRA and section 10 of the NLRA. Compare 115 ILCS 5/15 (West 2004), with 29 U.S.C. §160(c) (2000). In accord with federal decisions construing the NLRA, our appellate court has held that remedial orders of the Board are reviewed for abuse of discretion. *Paxton-Buckley-Loda Education Ass'n v. Illinois Educational Labor Relations Board*, 304 Ill. App. 3d 343, 353 (1999). The court in *Paxton-Buckley-Loda* explained that the Board has " 'substantial flexibility and wide discretion to ensure that victims of unfair labor practices be returned to the position that would have obtained had the illegal conduct not occurred.' [Citation.]" *Id*. Therefore, the purpose of the Board in fashioning a remedy in an unlawful labor practice case is to order a "make-whole" remedy that achieves this end. *Id.* at 353-54.

However, the Board has no authority with respect to the

interpretation of the School Code. In the context of the NLRA, the United States Supreme Court has observed:

> "[T]he Board [NLRB] has not been commissioned to effectuate the policies of the [NLRA] so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." *Southern S.S. Co. v. National Labor Relations Board*, 316 U.S. 31, 47 (1942).

Thus, where the policies of the NLRA conflict with another federal statute, the NLRB cannot ignore the other statute. Rather, it must fully enforce the requirements of its own statute, the NLRA, but must do so, as far as possible, in a manner that minimizes the impact of its actions on the policies of the other statute. *Can-Am Plumbing, Inc. v. National Labor Relations Board*, 321 F.3d 145, 153-54 (D.C. Cir. 2003); see *McLean Trucking Co. v. United States*, 321 U.S. 67, 79-80 (1944) (same, Interstate Commerce Commission).

Based on this reasoning, I conclude that the collective-bargaining agreement in the present case neither restricted nor expanded the powers conferred or the rights granted by section 24–11 of the School Code. See *Illinois Education Ass'n Local Community High School District 218 v. Board of Education of School District 218, Cook County*, 62 Ill. 2d 127, 130-31 (1975). This court has explained the significance of teacher tenure as follows:

> "The dispositive factor in our consideration is a determination of the intent of the legislature in enacting sections 24–11 and 24–12 of the School Code. One objective of teacher tenure is 'to assure continuous service on the part of teachers of ability and experience.' [Citation.] The tenure system is, we believe, intended to provide continuity and stability for students; provide some degree of job security, thus affording teachers the ability to pursue a career free from arbitrary hiring and firing; attract teachers of high quality; and retain experienced teachers. Since, however, the statutes create liabilities where none would otherwise exist, they must be strictly construed in order not to unduly interfere with the

responsibility of local boards to efficiently operate the educational systems." *Johnson v. Board of Education of Decatur School District No. 61*, 85 Ill. 2d 338, 344 (1981). Accordingly, the Board's authority to order make-whole relief does not extend to an award of tenure, which is a decision section 24–11 of the School Code vests in the District. Now that the Board has set aside the District's unlawful nonrenewal of Warning's contract, the District must be given the opportunity to exercise its statutory discretion regarding tenure.

The two Board members who dissented on the issue of awarding Warning tenure concluded as follows:

> "The proper remedy in this case would be to reinstate Warning for another final probationary year and order that she be evaluated by someone other than Principal Benoit or Dr. Betty Pointer. *** This remedy, rather than reinstatement with tenure, would place Warning in 'the position that would have obtained had the illegal conduct not occurred.' [*Paxton-Buckley-Loda*, 304 Ill. App. 3d at 353.] If Warning had not been non-renewed on the basis of her union activity, there would have been an assessment by [the District] as to whether tenure was appropriate on other grounds. Putting Warning in the position in which she would have been if a decision had not been made to non-renew her on the basis of her union activity includes allowing such an assessment."

I agree and would so hold. Courts must uphold and enforce the rights granted by collective-bargaining agreements. In fulfilling this duty, however, courts must be vigilant not to intrude upon the province of educational employers as provided by the School Code.

### III. CONCLUSION

For the foregoing reasons, I would affirm in part the judgment of the appellate court, which confirmed the Board's decision. I would uphold the Board's determination that the District committed an unfair labor practice when it dismissed Warning. However, I disagree with the Board that tenure is the proper remedy. Rather, I would restore Warning to a final probationary year under the conditions described in the Board's partial dissent.

JUSTICE THEIS joins in this dissent.